United States Court of Appeals,

Fifth Circuit.

No. 92-2807.

UNITED STATES of America, Plaintiff-Appellee,

v.

FIDELITY AND DEPOSIT COMPANY, etc., et. al., Defendants,

Fidelity and Deposit Company of Maryland, Defendant-Appellant.

Jan. 7, 1994.

Appeals from the United States District Court for the Southern District of Texas.

Before JOHNSON, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellee the United States of America (the government) sued Defendant-Appellant Fidelity and Deposit Co. of Maryland ("Fidelity") to collect on two bonds issued by Fidelity, one of which was issued in 1984 and the other in 1986. These bonds provided, inter alia, that Fidelity was surety for the payment of excise taxes by a distillery, the Bay River Company ("Bay River"). After the United States moved for summary judgment Fidelity argued that the 1984 bond was ambiguous, thus precluding summary judgment on it, and that governmental neglect should estop the government from collecting on the 1986 bond. The district court disagreed with both contentions and entered summary judgment for the government. Finding no reversible error, we affirm.

I

FACTS AND PROCEEDINGS

The federal government taxes the manufacturing of distilled spirits and requires the operator of a distillery to secure the payment of excise and operational taxes with various surety bonds. To ensure payment of operational taxes, the distiller must obtain an "operations bond" prior to commencing operations. If the distiller intends to remove any product from the distillery prior to payment of excise taxes, the distiller must likewise obtain a "withdrawal bond" to secure payment of any excise taxes due. The distiller has the option to acquire a "unit bond," which provides coverage

from the surety for both operational and removal excise taxes.

In 1984 Bay River began operating a distillery and obtained a surety bond from Fidelity. The top right portion of the face of this bond instructs the signers to indicate which type of bond is being issued, namely, an operations, a withdrawal, or a unit bond. On the 1984 bond, the box marked "operations" was left unchecked, whereas the box marked "withdrawal" and the box marked "unit" were both checked. The face of the bond also contained a box in which to insert the amount of the bond; on this 1984 bond the box was filled in to reflect the sum of $350,000. The back of the bond contained boxes for use in allocating coverage. Of the $350,000 face amount of the 1984 bond, $250,000 was allocated for operations coverage and $100,000 for withdrawal coverage.

Within its first year of operations, Bay River began to issue checks made payable to the IRS for excise taxes that were returned for insufficient funds ("NSF"). In February 1986, after Bay River had issued three NSF checks for excise taxes totalling $441,346.91, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") placed Bay River on prepayment status.[1] This status meant that Bay River was required to pay by cash or cashier's check before withdrawing any spirits from its plant; ATF nevertheless agreed orally to continue to accept company checks.

In April 1986, ATF conducted the first of three audits of Bay River. The auditors concluded that Bay River was underpaying taxes, financially unstable, and exceeding the withdrawal coverage provided by the 1984 Bond. A second audit in May 1986 disclosed the same essential facts. Meanwhile, company checks issued by Bay River continued to be returned NSF. In addition, by the summer of 1986, ATF became aware that Bay River was "floating" its funds, that is, Bay River was using unpaid accounts as collateral for cash loans to prepay excise taxes.

In November 1986, Fidelity issued Bay River a second bond, this one for $600,000, which provided coverage if Bay River defaulted on payment of its excise taxes. At the time of issuance, the government was aware that Bay River: 1) had issued 14 NSF checks totalling $821,221.64; 2) had

---

[1]The ATF and the IRS, both of which are agencies within the Department of Treasury, shared responsibility for collecting taxes due from Bay River during part of the relevant period. Until July 1987, Bay River paid its excise taxes to the IRS. When those checks bounced, the IRS notified both Bay River and ATF. In July 1987 new regulations required all distilleries, including Bay River, to make payment directly to ATF.

violated prepayment requirements;  3) had filed untimely tax returns;  4) had been floating funds;  and 5) generally was in poor financial health.  When it accepted the 1986 bond, the government did not provide any of this information to Fidelity.  In addition, the government had not yet sought recovery on the 1984 bond.  Fidelity, for its part, did not contact the government prior to issuing the 1986 Bond and instead relied on financial statements furnished by Bay River, which later proved to be inaccurate.

ATF conducted its third audit in September 1987 and informed Bay River in February 1988 of violations discovered by that audit.  In June 1988, the ATF met with Bay River after which the ATF issued a joint demand on Bay River and Fidelity for unpaid taxes.  Fidelity tendered $100,000 on the 1984 bond, but denied any further liability on that bond and all liability on the 1986 bond.  Fidelity argued that the 1984 bond provided only $100,000 coverage for excise taxes and that neglect in collecting excise taxes estopped the government from collecting on the 1986 Bond.[2]

In August 1989, the government sued Fidelity and Bay River to collect $1,572,714 in unpaid excise taxes.  The government acquired a default judgment against Bay River in June 1990.  The government moved for summary judgment against Fidelity as surety on the 1984 and 1986 bonds, which judgment was granted by the district court in September 1992.  The district court first determined that the 1984 bond was actually two bonds:  a $100,000 withdrawal bond and a $250,000 unit bond.  The court thus concluded that the 1984 bond provided $350,000 coverage.  Next, the court determined that any governmental neglect in collecting excise taxes did not estop the government from collecting on the 1986 bond.  Accordingly, the district court entered summary judgment in favor of the government for $850,000, which reflected the aggregate face amount of the two bonds:  $950,000, less the $100,000 payment that Fidelity had tendered.  Fidelity timely

---

[2]In its brief, Fidelity intimates that part of the liability imposed on the 1986 bond arises from debts due before that bond was issued.  Fidelity uses this alleged fact to argue that the government should be estopped from collecting on the 1986 bond in toto.  Curiously, though, Fidelity makes no argument that preexisting debts as such are not covered by the 1986 bond.  Instead of raising issues of estoppel, this argument would entail application of general principles of suretyship law to ascertain the limits of the surety relationship.  *Cf., St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.,* 646 F.2d 1064, 1074 (5th Cir.1981) (observing that a surety insures performance of a contingent obligation;  it is not a guarantor of an existing default).

appealed.

## II

## DISCUSSION

A. *Construing the 1984 Bond*

We review a summary judgment de novo, applying the same standard as the district court.[3] Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[4] Summary judgment is appropriate here regarding the coverage provided by the 1984 bond if that bond is unambiguous.[5] And whether an instrument is ambiguous is a question of law that turns on whether the instrument "can be given a certain or definite legal meaning or interpretation."[6]

1. *The Regulatory Scheme*

The regulatory scheme regarding excise tax bonds provides the appropriate starting point to determine whether the 1984 bond is ambiguous. Section 5173 of the Internal Revenue Code provides that no person can commence operations at a distillery unless such person has obtained an operations bond, and that no distilled spirits may be withdrawn from a distillery without payment of excise taxes due unless the distiller has obtained a withdrawal bond.[7] Section 5173 further provides that the Secretary of the Treasury may promulgate regulations allowing for a unit bond to cover both operations at, and withdrawals from, a distillery.[8]

The regulations promulgated by the Secretary provide that the total amount of a unit bond shall be available for satisfaction of *any* liability—irrespective of whether liability arises from

---

[3]*E.g., D.E.W., Inc. v. Local 93, Laborers' Int'l Union,* 957 F.2d 196, 199 (5th Cir.1992); *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 207 (5th Cir.1991).

[4]FED.R.CIV.P. 56(c).

[5]*See, D.E.W., Inc.,* 957 F.2d at 199 (noting that an unambiguous contract can be construed as a matter of law).

[6]*Id.* at 199.

[7]26 *U.S.C.* § 5173(a).

[8]26 *U.S.C.* § 5173(c).

operational or excise taxes—incurred under the terms and conditions of such bond.[9] The regulations further provide that the unit bond must allocate the total sum into "penal sums" for operations and withdrawals.[10] Although the surety remains liable up to the total amount of the unit bond, the "penal sum" for withdrawals sets the limit for such withdrawals from the distillery.[11]

2. *Application to the 1984 Bond*

The provisions in the 1984 bond may be construed together in conformity with applicable federal statutes and regulations only if that bond is construed as a $350,000 unit bond.[12] The back of the 1984 bond contains the allocation ($100,000 for withdrawal coverage and $250,000 for operations coverage) mandated by the regulatory scheme for unit bonds. The face contains a check in the unit bond box, which, in addition to being consistent with the allocation of coverage contained on the back, also indicates that the parties intended that the 1984 bond provide coverage for both operational and excise taxes to the full amount of that bond. The additional check in the withdrawal box is not inconsistent with unit bond status as such coverage is subsumed within that status under the federal regulations. This check is thus properly characterized as harmless surplusage under the applicable regulations.

In contrast, the construction offered by Fidelity conflicts with the intent of the parties as manifested by the face of the 1984 bond. Fidelity posits that the 1984 bond represents two separate bonds: an operations bond for $250,000 and a withdrawal bond for $100,000. Yet the face of the 1984 bond contains checks in only the unit and withdrawal bond boxes. Thus, Fidelity's construction would have us ignore the check of the unit bond box—which imposes liability for both operational and excise taxes to the full amount of the bond—and would require us to deem the existence of a

---

[9]27 *C.F.R.* § 19.244 (1993);  *see also,* 26 *U.S.C.* § 5173(g) (providing that "[t]he total amount of any bond furnished under this section shall be available for the satisfaction of any liability incurred under the terms and conditions of such bond").

[10]27 *C.F.R.* § 19.244 (1993).

[11]*Id.*

[12]*Cf., Chapman v. Orange Rice Milling Co.,* 747 F.2d 981, 983 (5th Cir.1984) (observing that a court must attempt to harmonize all provisions contained in an agreement in order to construe that agreement to give effect to the parties' intent).

check in the operations box, which is totally blank. We are unwilling to take either step.

The district court's construction—that the bond is a $250,000 unit bond and a $100,000 withdrawal bond—likewise fails for it runs afoul of federal regulations.[13] Such a construction would require the parties to fill in two lines on the back of the bond: one line for the amount of withdrawal coverage for the withdrawal bond under 27 C.F.R. § 19.243, and the other line for the allocation between operations and withdrawal coverage for the unit bond under 27 C.F.R. § 19.245. That simply does not make sense.

As the 1984 bond is consistent with federal regulations only if it is construed as a $350,000 unit bond, we conclude that this bond must be unambiguously construed to be such. Any other construction would be nonsensical under federal law, as such constructions would require us either to rewrite the bond or to make the bond conflict with federal law.[14] Although the district court erred in its reasoning it reached the correct result on this issue, i.e., that Fidelity was liable for $350,000. Consequently, the district court's judgment imposing $350,000 liability (less the earlier $100,000 payment by Fidelity) on the 1984 bond need not be reversed.[15]

## B. *Estoppel and the 1986 Bond*

Few reported cases address the estoppel doctrine when the government is the beneficiary of a surety bond for excise taxes. The seminal case is the venerable 1877 Supreme Court decision of *Hart v. United States*.[16] In *Hart* a surety attempted to avoid liability on an excise tax bond by arguing

---

[13]The attempt by the district court to create two bonds here is also inconsistent with the language used in the 1984 bond, which refers to the instrument throughout in the singular as a "bond." Fidelity's attempt to create two bonds, albeit of different stripes than the ones created by the district court, likewise is inconsistent with the singular language used in the 1984 bond.

[14]*See, e.g., Consul Ltd. v. Solide Enterprises, Inc.,* 802 F.2d 1143, 1149 (9th Cir.1986) (observing that contractual language is interpreted whenever possible to uphold the validity of the contract); *Ford Motor Credit Co. v. Powers,* 613 S.W.2d 30, 33 (Tex.Civ.App.—Corpus Christi 1981, no writ) (concluding that reasonable doubt about the construction of a contract should be resolved in favor of legality).

[15]*See, e.g., Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986) (observing that a grant of summary judgment may be affirmed on grounds that differ from the ones relied on by the district court).

[16]95 U.S. 316, 24 L.Ed. 479 (1877).

that liability was caused by the illegal acts of a revenue agent, namely, allowing the distiller to remove spirits without paying taxes.[17]  The Court rejected any defense based on estoppel, stating that "[t]he government is not responsible for the laches or wrongful acts of its officers.  Every surety upon an official bond is presumed to enter into this contract with a full knowledge of this principle of law, and to consent to be dealt with accordingly."[18]  The Court further stated that "[the government] never becomes bound to others from [the] neglect [of its officers], unless it is by express agreement to that effect,"[19] and concluded "[a]s between himself and the government, [the surety] took the risk of the effect of official negligence."[20]

Over one hundred years later, in *United States v. Fulton Distillery, Inc.*[21], we revisited the surety-government relationship.  Once again, the government was suing to collect on an excise tax bond issued by a surety.[22]  And once again, the surety attempted to avoid liability by arguing that governmental inaction estopped the government from collecting on the bond.  Specifically, the surety complained that the government failed to put the distiller on a cash prepayment plan for excise taxes until eight weeks after the government had received the first dishonored check.[23]  The surety reasoned that this action violated an implied duty arising from the applicable governmental regulations, and that such action also increased the surety's risk, which, under general suretyship law, should discharge the surety.[24]

---

[17]*Id.,* 95 U.S. at 317.

[18]*Id.* at 318.

[19]*Id.*

[20]*Id.* at 319.

[21]571 F.2d 923 (5th Cir.1978).

[22]*Id.* at 924.

[23]*Id.* at 925-26.

[24]*Id.* at 926.

Reaffirming reliance on *Hart,* we rejected both of the surety's arguments.[25] We first concluded that any dispute regarding the collection of an excise tax bond is governed by federal law.[26] We then rejected the *implied duty* argument by concluding that *Hart* controlled—the government could only assume such a duty by statute or by *express* agreement.[27] Quoting *Hart,* we likewise rejected any argument concerning governmental acts that may have increased the surety's risk: "[a]s between [the surety] and the government, [the surety] took the risk of the effect of official negligence."[28] In *Fulton Distillery* we concluded by observing that under federal law, a surety has been on notice of this principle for over 100 years.[29]

Relying on *Fulton Distillery* and *Hart,* the district court in the instant case concluded that Fidelity could not assert estoppel against the government. As the district court correctly surmised, *Hart* and *Fulton Distillery* control here. Condensed to its essence, Fidelity's complaint is premised on the notion that the government owed it an implied duty to act—by more vigorously engaging in collection efforts pursuant to federal regulations (thereby lowering Fidelity's exposure to risk), by providing Fidelity with direct notice of the precarious financial condition of Bay River,[30] or by providing indirect notice of Bay River's financial condition through the issuance of a demand on the 1984 bond. Both *Hart* and *Fulton Distillery* make it clear, though, that the government—regardless

---

[25]This court concluded that *Hart* was not overruled by the *Erie* revolution because *Hart* had been cited with approval post-*Erie* by the Supreme Court. *Id.* at 927 n. 9.

[26]*Id.* at 926-27.

[27]*Id.* at 927.

[28]*Id.* (quoting *Hart,* 95 U.S. at 319).

[29]*Id.*

[30]Fidelity's effort to impose a duty to disclose information regarding the financial status of the principal is problematic under 26 *U.S.C.* § 6103(a). Section 6103 provides that "return information" shall not be disclosed, and in *Chamberlain v. Kurtz,* 589 F.2d 827, 840-41 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979), we construed "return information" broadly to include any information gathered by, or generated internally by, the government with regards to a taxpayer's liability. As information gathered to collect excise taxes falls within the prohibition against disclosure in § 6103, *Ryan v. Bureau of Alcohol, Tobacco, and Firearms,* 715 F.2d 644 (D.C.Cir.1983), imposing a duty to disclose in this context would force the government to make a Hobson's choice—either disclose and risk violating § 6103, or refuse to disclose and risk estoppel. We decline to impose such a duty.

of whether it is following its own rules and regulations[31]—owes no *implied* duties to a surety on an excise tax bond.[32]

Fidelity attempts to avoid the clear mandate of *Hart* and *Fulton Distillery* by relying on a statement made at the end of *Fulton Distillery.* In that statement, this court observed that "we would be faced with a more difficult determination if the Government had failed altogether to act."[33] This musing, though, is merely dictum.[34] As such it cannot controvert the clear command of the Supreme Court in *Hart*—in which the federal official allegedly permitted the distiller to violate the law[35]—that the government cannot be estopped from collecting on excise tax bonds due to neglect or misconduct by its officials.[36]

---

[31]Fidelity and the United States vigorously contest whether the ATF's decision to accept company checks from Bay River after it was placed on prepayment status violates 27 *C.F.R.* § 19.519.

[32]As this case does not involve any affirmative misrepresentations by the government to Fidelity, we express no opinion on this issue. *Cf., Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation, etc.,* 976 F.2d 934, 938 & n. 13 (5th Cir.1992) (noting that governmental action going beyond mere negligence, delay, or inaction may give rise to estoppel).

[33]*Fulton Distillery,* 571 F.2d at 928.

[34]Fidelity vigorously contends that *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.,* 646 F.2d 1064 (5th Cir.1981) controls the instant case—presumably as the embodiment of *Fulton Distillery* 's "more difficult case" dictum. In *St. Paul* the Commodity Credit Corporation ("CCC") failed to force the principal properly to redeem trust receipts, thereby impairing the collateral of the surety in the cotton represented by those receipts. *Id.* at 1067-73. Adopting general principles of commercial suretyship law, we concluded that the misconduct of the CCC estopped it from collecting on the suretyship bond. *Id.* at 1073-74.

> *St. Paul* was decided three years after *Fulton Distillery,* but in *St. Paul* we addressed different subject matter and a different government agency engaged in a distinctly commercial role—the facilitation of cotton trading through the issuance of trust receipts by the CCC. In contrast, both *Hart* and *Fulton Distillery* directly address the subject matter of the instant case: both involve an attempt by a surety to avoid payment on excise tax bonds because the government neglected to collect taxes properly. The fact that in *St. Paul* we failed even to cite either *Hart* or *Fulton Distillery*—much less attempt to resolve the "more difficult case" dictum in *Fulton Distillery*—implies our belief that we thought the excise tax bond cases inapposite. In reciprocal manner, we conclude that *St. Paul* is inapposite to cases involving surety bonds for excise taxes.

[35]*Hart,* 95 U.S. at 317-18.

[36]The Supreme Court has also given no indication that it wishes to retreat from a narrow approach to estoppel in other contexts. For example, in its most recent case addressing estoppel, *Office of Personnel Management v. Richmond,* 496 U.S. 414, 422, 110 S.Ct. 2465, 2470, 110

We also observe that our refusal to estop the government here works no unfairness on Fidelity. Commercial expectations have been satisfied: Since *Hart* in 1877, sureties have been on notice that they assume the risk of governmental neglect in the collection of excise taxes. Continuation of *Hart* 's "bright line" rule—and rejection of any attempt to engraft a "more difficult case" exception onto this rule—provides certainty to sureties so that they can order their actions accordingly. Under this approach a surety maintains several options to protect itself: For example, the surety may charge a higher fee to compensate for added costs associated with the risk of governmental neglect, or may engage in more active monitoring of the distiller.

### III

### CONCLUSION

Fidelity and Bay River filled out the 1984 bond in such a way that the 1984 bond is consistent with federal regulations only if it is construed as a unit bond. Consequently, in order to give that bond a definite legal meaning, we must conclude that the 1984 bond was meant to be a unit bond. The 1984 bond thus provides coverage for excise taxes up to its full face amount of $350,000. Although the district court erred in its reasoning on this issue, its judgment imposing $350,000 liability on this bond (less the $100,000 prior payment by Fidelity) is correct.

We also conclude that the district court correctly decided that the government was not estopped from collecting on the 1986 bond. Simply put, the government owes no implied duties to a surety regarding the collection of excise taxes. Consequently, the government cannot be estopped here because it failed to collect excise taxes vigorously or to disclose Bay River's precarious financial condition to Fidelity.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

L.Ed.2d 387 (1990), the Court observed that it has reversed *every* circuit court finding of estoppel against the government that it has reviewed.