**In re DOW CORNING CORPORATION,**
**Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Dec. 21, 1999.

See also 244 B.R. 718; 244 B.R. 634; 244 B.R. 673; 244 B.R. 678; 244 B.R. 696; 244 B.R. 705.

---

*OPINION ON BEST–INTERESTS–OF–CREDITORS TEST, FEASIBILITY, AND WHETHER PLAN AND THE PROPONENTS COMPLY WITH THE APPLICABLE PROVISION OF TITLE 11*

ARTHUR J. SPECTOR, Chief Judge.

The Debtor and the Official Committee of Tort Claimants ("TCC") filed a Joint Plan of Reorganization on November 9, 1998. An order confirming the Plan in its amended and modified form was entered on November 30, 1999. In conjunction with that order, the Court on the same date released its Findings of Fact and Conclusions of Law. This is the last in a series of opinions serving to supplement and explain these findings and conclusions.

A general overview of the Plan's terms is contained in the opinion on classification and treatment issues. When necessary, additional Plan terms are explained here. Except when otherwise stated, all statutory references are to title 11 of the United States Code (the Bankruptcy Code).

## I. Section 1129(a)(7)

The two strongest § 1129(a)(7) objections were raised by several parties, but were argued most vociferously by certain Nevada Claimants represented by the law firm of White and Meany. The first of these objections stems from the $400 million net present value cap on the Litigation Facility's liability. The second pertains to the Plan provision disallowing punitive damages. These objectors argued that, as a result of these provisions, the Plan does not insure that claims of breast-implant claimants who choose to litigate would be paid an amount not less than what they would receive via a chapter 7. Both of these arguments raise the best-interests-of-creditors test, 11 U.S.C. § 1129(a)(7), as a bar to confirmation. These are legitimate and difficult issues from an academic standpoint. Unfortunately for the objectors, the evidence at the confirmation hearing does not support a finding in their favor.

 The Plan proceeds on the assumption that $2.35 billion (net present value) will be sufficient to pay all personal injury claims in full, either through settlement or litigation. The Proponents assert that the Court can make a finding of fact that the funding is adequate to accomplish this task. But the Nevada Claimants insist that a plan must provide absolute certainty that the confirmation standards are met, most especially the best-interests-of-creditors standard. They argue that so long as there is any doubt on the subject, the Plan cannot provide for classes subordinate to them. But such is not the standard for confirmation of a plan. Findings of fact at a confirmation hearing are by a mere preponderance of the evidence. *In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 479 (Bankr.E.D.Mich.1995). Certainty is never the test in a bankruptcy reorganization. It is commonplace for a plan to make provisions for creditor classes as well as to reserve equity for equity classes. If the reorganized debtor defaults some time after plan confirmation, and some

creditors are left unpaid, usually their sole recourse is to enforce their allowed claim in a nonbankruptcy forum. In other words, equity does not revert to creditors.[1] *In re Xofox Indus., Ltd.*, 241 B.R. 541, 542–44 (Bankr.E.D.Mich. 1999); *In re Jordan Mfg. Co.*, 138 B.R. 30, 37 ("When a Chapter 11 plan is confirmed and the debtor fails to pay, the creditors' remedy is not to seek a revocation of the discharge, but rather to enforce the debtor's obligation to the creditor arising out of the Chapter 11 proceeding.") (quoting *In re Curry*, 99 B.R. 409, 410 (Bankr.C.D.Ill.1989)); Randy P. Orkik, *Conversion After Chapter 11 Plan Confirmation What Is It Good For?—Absolutely Nothing!*, 23 Cal. Bankr.J. 91, 95 (1996) ("Breach of a plan, in and of itself, is not grounds for revocation of the order of confirmation. The parties seeking revocation must show fraud in procuring confirmation of the plan.").

Until an effective time machine becomes available, a certain percentage of trials will continue to reach a factually incorrect result. In most courts trials require the judge or jury to determine an historical fact. Did this defendant murder the decedent? Did this defendant run the red light and thereby cause injury to the plaintiff? Bankruptcy judges are sometimes called upon for fact-finding of a similar nature. Did this debtor deface the plaintiff's automobile so that the resulting damages are nondischargeable? But by far the more common form of "fact-finding" is of a future event. Bankruptcy judges make all sorts of prognostications in the form of "findings of fact." For example: Is the secured creditor's claim adequately protected by a replacement lien on new inventory? Does the chapter 13 plan provide "that all of the debtor's projected disposable income to be received in the three-year period ... will be applied to ... the plan?" 11 U.S.C. § 1325(b)(1)(B). Is it likely that confirmation of the plan will "be followed by the liquidation, or the need for further financial reorganization, of the debtor?" 11 U.S.C. § 1129(a)(11). Juries err from time to time. It has always been so. It will likely forever be so. People have lost their lives because a jury mistakenly thought—beyond a reasonable doubt no less—that they were guilty of capital offenses. People and companies have been bankrupted due to a jury's erroneous finding—by a mere preponderance of the evidence—that the defendant caused the plaintiff harm. Yet even with this knowledge, the criminal and civil justice systems plod on. To paraphrase Sir Winston Churchill: It has been said that our legal system is the worst ... except for all the others that have been tried.

The Nevada Claimants protest that, because this Court might err in its prognostication that the Litigation Facility is sufficiently funded to pay all claims which survive trial, the Plan cannot be confirmed. But, as noted, the possibility of error is inherent in any ruling. A court cannot let that possibility paralyze it from making the tough decisions. A court relies on the evidence and whatever learning and common sense it can bring to the case to make the best judgment available.

In this case, on the issue of the sufficiency of the net present value $400 million Litigation Facility funding, the question is not even close. In order to properly justify this statement, however, we must first deal with the issue of punitive damages, for if punitive damages were realistically available, there would be more doubt about the previous finding.[2]

---

1. That is, unless the plan itself provides for such a remedy. *See, e.g., In re Winom Tool & Die, Inc.*, 173 B.R. 613, 621 n. 2 (Bankr. E.D.Mich.1994).

2. This hesitancy is only logical. Nevertheless, the Proponents' principal witness on this issue, Frederick C. Dunbar, testified that his determination that the Litigation Facility's funding would be more than adequate would remain unchanged even if punitive damages were permitted. *See Transcript*, June 29, 1999, at 247–48.

728

## A. Punitive damages

■ It is true that unsecured creditors are entitled to be paid not just the compensatory damages of their claim, but any exemplary, punitive or multiple damages, before equity is entitled to receive any distribution in chapter 7. 11 U.S.C. § 726(a). In this Plan, the equity security holders will retain their shares in the reorganized debtor, worth billions of dollars, while creditors who might theoretically be entitled to punitive or multiple damages would receive nothing for that species of claim. But a theoretical right of recovery is of no moment unless those creditors are actually entitled to such damages.

This is an issue that was litigated, and though the proofs were skimpy, they were decidedly one-sided. Several witnesses testified generally that, in their opinion, the Plan (and more specifically the Settlement and Litigation Facilities) provide for the full payment of all personal injury claims against the estate. Among the several witnesses so testifying was Arthur B. Newman, a senior managing director of The Blackstone Group. The Plan provides for payment of $2.35 billion net present value for tort claimants. Without serious contradiction on cross-examination or otherwise, Mr. Newman testified that in his opinion, in the aggregate, creditors would receive in a chapter 7 no more than they would receive pursuant to the Plan. *Transcript,* July 14, 1999, p. 99. Moreover, before unsecured claims can be paid, they must be liquidated. Without a settlement framework like the one in the Plan, the cost of liquidating hundreds of thousands of claims would be monumental. *See generally In re Dow Corning Corp.,* 211 B.R. 545 (Bankr.E.D.Mich.1997). There is no way of knowing what type of process would be utilized in the chapter 7. Certainly a trustee would not simply lie down and let the personal injury claimants name their own damage figure. It is probable, therefore, that a chapter 7 estate would defend on liability grounds as well. In this Court's experience, expenses of adminis-

tration in the likely event of protracted claims litigation and appeals would be enormous. This would leave a much depleted estate for creditors. And, unless the estate were more-or-less exonerated of liability as a result of some consolidated megatrial, (in which case, of course, no tort claimant would be entitled to punitive damages anyway), it is more likely than not that the total of all allowed claims in the hypothetical chapter 7 would exceed the remaining funds available for disbursement to them. Since funds would be insufficient to pay all of the compensatory damages, no creditor would receive a penny of exemplary, punitive or multiple damages, even if she were otherwise found entitled to it.

The Proponents also called as an expert witness Frederick C. Dunbar, a senior vice-president at National Economic Research Associates, Inc. He is a statistician with a PhD in economics and a leading expert on matters involving estimation in mass tort cases. In addition to the general tenor of his entire testimony that all claims would be paid in full, Mr. Dunbar testified that he had studied every breast implant verdict in the past 3½ years and found that no punitive damages had been awarded to plaintiffs. He further testified that even Dow Corning had not been hit with a punitive damage verdict since 1992. *Transcript,* June 30, 1999, at 48. In one well-publicized breast-implant case during this time period a jury returned a verdict for compensatory and punitive damages, but the punitive damages portion of the verdict was set aside. *Transcript,* July 15, 1999, at 149 (Statement of Geoffrey White). *See Dow Chemical Co. v. Mahlum,* 114 Nev. 1468, 970 P.2d 98 (1998).

■ In the face of this testimony, the Nevada Claimants and others were silent. As a result, theory was trumped by facts. Based on the evidence, the Court can make only one factual finding and that is that punitive damages would not be paid by a trustee in a chapter 7 case. Therefore, the Plan which provides for no puni-

tive damages does not violate the individual rights of any rejecting tort claimant and so satisfies § 1129(a)(7).

 For what it is worth, the Proponents also raise an interesting legal issue with regard to the Plan's express refusal to provide for punitive damages. The argument goes as follows. Punitive damages are for the purposes of punishing wrongdoers and deterring them and others from further wrongdoing. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious and to deter him and others from similar extreme conduct."). Punitive damages may be no greater than what is "reasonably necessary" to achieve these goals. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 563, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). According to the Proponents, the goals of deterrence and punishment are adequately met in this case without resort to punitive damages because the amount of compensatory damages being paid is sufficient in itself to accomplish these objectives. *Rosado v. Santiago,* 562 F.2d 114, 121 (1st Cir.1977) (reversing punitive damages award because "[a]n award of actual damages coupled with reinstatement [of employment] is ample relief ... and a sufficient deterrent to future wrongdoing"); *In re Kratzer,* 9 B.R. 235, 239 (Bankr.W.D.Mo.1981) (the "award of compensatory damages ... is sufficient to punish the defendants"); *Magallanes v. Superior Court,* 167 Cal.App.3d 878, 886, 213 Cal.Rptr. 547, 552 (1985) (where "the objectives of punishment and deterrence appear to be sufficiently met by the enormity of the present and prospective awards of compensatory damages" and where "the offending goods have long since been removed from the market place," punitive damages against a product manufacturer were refused); *Quick Air Freight, Inc. v. Teamsters Local Union*

*No. 413,* 62 Ohio App.3d 446, 575 N.E.2d 1204, 1217 (1989) (punitive damages need not be awarded when compensatory damages are sufficient to punish defendants and to deter them and others from similar conduct); *see also* 22 Am.Jur.2d Damages § 264 (Punitive damages "should not be awarded in a case where the amount of compensatory damages is adequate to punish the defendant.").

There is no question but that the ordeal that the Debtor has gone through over the last decade, and more particularly in the nearly five years this case has been pending in bankruptcy court, coupled with the enormous damages it has agreed to pay while still believing that it is not responsible for any of the alleged harms, is truly a deterrent to future conduct which might entail risks of public harm. No rational company would knowingly engage in activity that would risk its continued existence, especially after having so narrowly escaped oblivion.

On the question of punishment, it is easy for this Court to simply say that the Debtor has been punished enough. However, if in fact the Debtor's products caused the harms alleged (something that this Court has no need nor opportunity to decide), and if the product came to market in a manner which justifies punitive damages, then it is difficult to make such a finding. But these more metaphysical questions need not be decided at this time since the record nevertheless supports the Plan's provision for omission of punitive damages.

**B. The Sufficiency of the Funding of the Litigation Facility**

 The evidence was overwhelming that $400 million net present value would be more than sufficient to pay all personal injury claims resolved through litigation in full even after factoring in the costs of the process. The evidence took multiple forms. The first such evidence came from Tommy Jacks, a plaintiff's personal injury lawyer who represented many clients suing the Debtor over their breast implants,

who was a member of the Official Committee of Tort Claimants, and who helped negotiate the Plan. He testified that, in his opinion, the funding of the Litigation Facility was adequate for the purpose intended.

Q And do you have a view as to whether or not the $400,000,000 net present value will be adequate to satisfy non-settling claims in full?

A I do have.

Q And what's the basis for your view?

A Well, ... my view is based upon my knowledge and experience as a lawyer who is familiar with this litigation and ... there are a number of reasons why I believe that the amount provided in the facility is ... an adequate amount.

...

A I think ... the settlement aspects of this plan are far more beneficial ... to claimants and to a broader class of claimants than was the corresponding settlement provision made available through the revised settlement program.

I think on that basis that we will see a greater acceptance of the settlement facility and a lower propensity of claimants to opt out. I think at the same time we can't under estimate [sic—overestimate] the effect that the passage of time itself has had in these cases. And I think that's reflected very much in the vote of the various classes of claimants, the overwhelming acceptance of the plan by the vast majority of claimants.

In women who have claims to assert in this case, whether by settlement or by litigation, ... most of them [have] been involved in litigation now going back to the early 1990's. Certainly to 1992, some seven years. There is, I believe, a tremendous desire of women to achieve closure of their claims.

And I think that will prompt the settlement of claims. The litigation environment I think is an important factor.... [W]hatever you think about it, it's a more difficult environment for claimants to litigate their claims now than it has been in the past however much we may disagree with conclusions.

For example ... the science panel or more recently ... the National Institute of Medicine. The fact is that those fairly weighty opinions are there and will be given importance by some Courts. And it's for all those reasons I think the expectation should be of ... a very small number of opt outs.

And I know that's certainly going to be the case ... among my own clientele as compared with the days of the global settlement or revised settlement program. And I believe that the $400,-000,000 amount of funding that's provided is an adequate amount for those claims that will be opted out and litigated.

*Transcript*, June 28, 1999, at 161–63; *see also id.* at 229–256.

The most important—and impressive—witness on the adequacy of the Litigation Facility's funding was Mr. Dunbar. His qualifications, both educational and experiential, were exquisitely matched to the task for which he was retained. His testimony was thorough, logical, well-documented, and credible. Notwithstanding attempts at cross-examination and at obfuscation in closing argument, the purity of his reasoning shines through.

As the record established, and as is generally well-known, other large breast-implant manufacturers agreed to a revised settlement program in the context of the MDL 926 proceedings in Birmingham, Alabama (the "RSP"). The Plan was based largely on the RSP, but there were significant differences. Mr. Dunbar testified that because of demonstrated enhancements in the current plan from the RSP, a greater percentage of the eligible population will elect to settle in the Settlement Facility than elected to settle in the RSP. Concomitantly, a smaller percentage of people entitled to do so will opt to litigate in the Litigation Facility. To arrive at an appropriate settlement/litigation ratio, he also used data from a similar mass-tort

bankruptcy case, that of A.H. Robins Co.[3] Mr. Dunbar's conclusions on the number of expected litigants was based purely on his statistical models—a model that was theoretically not much different from the one routinely used by real estate appraisers in bankruptcy cases. The factors Mr. Jacks testified about—the increasing fatigue of breast-implant claimants over the lengthy delays; the recent tide of anti-plaintiff scientific studies and resultant publicity; the expansion of the *Daubert* line of cases—played no part in Mr. Dunbar's calculations. His methodology was beyond reproach and his estimation that 7,513 people would opt into the Litigation Facility is adopted by this Court. Moreover, Mr. Dunbar's scientific approach was corroborated to a large extent by the testimony of Tommy Jacks, and even by a witness called by objecting claimants, John C. Thornton III. *Transcript,* July 16, 1999, at 40–58.

Mr. Dunbar next had to determine what the average award would be for plaintiffs proceeding to litigation in the Litigation Facility. Because he was precluded from obtaining information about the settlement of RSP opt-out claimants by a gag order imposed by Judge Pointer, *see In re Dow Corning Corp.,* 237 B.R. 364, 371 (Bankr. E.D.Mich.1999), Mr. Dunbar used what he believed was the closest comparable experience—the Dalkon Shield Claimants Trust experience arising from the bankruptcy proceeding of A.H. Robins Co. The information Mr. Dunbar obtained on the Dalkon Shield Claimants Trust was supplemented and corroborated by the testimony of Professor Georgene M. Vairo, who has been the chairperson of the board of trustees of this Trust since 1989. Based on that comparison, Mr. Dunbar concluded that the anticipated average cost of resolving each breast-implant claim, factoring in both plaintiff and defendant verdicts as well as settlements of

claims of both domestic and foreign claimants in the Litigation Facility, would be approximately $11,700 in nominal terms. Simple multiplication results in a total nominal expense to the Litigation Facility for resolving breast implant claims of approximately $88 million. Mr. Dunbar then determined that the nominal legal and administrative costs of resolving these claims would be approximately $43.6 million, taking the total nominal costs of resolving breast-implant claims in the Litigation Facility to about $131.6 million.

In addition, the Litigation Facility would be tasked with resolving various other claims such as personal injury claims stemming from products other than breast implants, claims of breast-implant claimants whose implants were made by non-Debtor manufacturers with Dow Corning-produced silicone gel, and the claims of certain commercial and governmental health care providers and insurers. In the aggregate, Mr. Dunbar estimated that these other claims would cost the Litigation Facility approximately $26 million, nominally.

All tolled, Mr. Dunbar testified that the cost to the Litigation Facility for disposing of all disputed personal injury claims in nominal terms, including an allowance for administrative and legal expenses, would come to approximately $157.6 million. The Litigation Facility is expected to pay out funds over a 16–year life. Mr. Dunbar used a 7% discount rate, and calculated that the net present value of this figure is about $83 million. Thus, the $400 million net present value funding of the Litigation Facility is almost five times what will be necessary to satisfy all claims funneled to it.

No credible evidence was introduced to show otherwise. But of all places, a vociferous attack on Mr. Dunbar came from counsel for the Official Committee of Physician Claimants, a party that appeared not to have a dog in this fight.[4] After

---

3. Although certain claimants vehemently argued that the A.H. Robins experience was not relevant to this task, Mr. Dunbar persuasively explained why it was.

4. Class 12, a class containing the claims of the physician claimants, voted to accept the

considering the logic behind the attack on Mr. Dunbar's methodology and conclusions, the Court rejects it. The argument is anything but obvious and no witness, expert or otherwise, makes the case posited. In summary, then, this Court entirely credits the testimony of Mr. Dunbar and adopts in full his findings with regard to the adequacy of the Plan's funding, and specifically, the Litigation Facility's funding for personal injury claims.

## II. Feasibility

■ Two years ago, this Court explained why finding that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor," would be a simple task. *See* 11 U.S.C. § 1129(a)(11). In our estimation opinion, we noted that the Debtor's then plan did not say:

"The Reorganized Dow Corning will pay all tort claims in full. The Debtor expects that the $600 million set aside in the Settlement Trust and the $1.4 billion reserved for the Litigation Trust will be sufficient to do that. However, if it proves to be inadequate, the Reorganized Debtor will nevertheless pay however much is required to satisfy all such claims in full." Such a provision would truly be a promise to pay all tort claims in full. And if the Debtor's plan did contain this hypothetical provision, it would be necessary to determine the aggregate value of tort claims because that value could potentially exceed the financial capabilities of the Reorganized Debtor. *Nobody doubts the Debtor's ability to put up war chests totaling $2 billion.* But it could be that the aggregate amount of tort claims far exceeds $2 billion and that the Reorganized Debtor is incapable of paying the additional amounts necessary to satisfy those

claims in full. In that case, the Court could not confirm the proposed plan because the Debtor would be unable to satisfy 11 U.S.C. § 1129(a)(11), commonly referred to as the requirement to establish the "feasibility" of a plan.

Instead, the Debtor's plan essentially says: "The Reorganized Dow Corning will set aside $600 million for settlement of personal injury claims and an additional $1.4 billion for litigation of personal injury claims. The Debtor expects that these amounts will be sufficient to pay all such claims in full. However, if it proves to be inadequate, the claimants will nevertheless receive only that amount and have to share these amounts *pro rata.* To the extent these claimants are not paid in full, the remaining debt will be discharged."

From this summary it is clear why estimation is not necessary for plan confirmation purposes. *The Reorganized Debtor's ability to pay tort claims in full would simply not be an issue under § 1129(a)(11) for no matter how large the actual aggregate tort liability may turn out to be, the Reorganized Debtor would clearly be able to perform the pertinent terms of the plan. If the Court estimated the aggregate claims at something within the $2 billion treasury, the plan would be feasible. If the Court estimated the claims at an amount far in excess of $2 billion, the plan would still be feasible, because the Reorganized Debtor's obligation is capped by the plan at $2 billion, and the Debtor has $2 billion.*

*In re Dow Corning Corp.*, 211 B.R. 545, 568–69 (Bankr.E.D.Mich.1997) (emphasis added).

Though much about the current Plan differs from the earlier one, the cap on the Litigation Funding plus the possibility

Plan by an overwhelming 91.4%. Nevertheless, the Physicians' Committee felt somehow constrained to oppose the Plan. Despite having virtually nothing to ask Mr. Dunbar on cross-examination, and calling no witnesses

of his own, counsel unloaded a substantial blast during closing arguments and in a post-trial memorandum at Mr. Dunbar's methodology and conclusions.

(however slight), that personal injury claims are not fully satisfied out of those funds, remains. In this case, no one seriously disputes the Debtor's ability to put up a war chest of $2.35 billion net present value for those claims. *See Funding Payment Agreement,* § 2.01. Nor for that matter is there any doubt that the Debtor will be able to fully fund its entire obligation under the Plan to pay $3.8 billion (net present value) over the Plan's term. And Mr. Newman so testified.

Obviously, the Debtor will be able to satisfy its Plan obligations without liquidating or further financial reorganization.

### III. Proponents Comply With Applicable Provisions of Title 11

"The court shall confirm a plan only if ... (2) [t]he proponent of the plan complies with the applicable provisions of this title." Section 1129(a)(2). This section is worded peculiarly. Exactly how does a plan proponent *comply* (present tense) with the applicable provisions of title 11? One would think that the sentence should have been written in the past tense, for as he stands before the court at the confirmation hearing, the proponent cannot help but comply with title 11: He isn't doing anything at the moment.

Probably because the sentence makes no sense as written, treatises and cases have had to infuse it with meaning. Section 1129(a)(2) has been interpreted to pertain almost exclusively to solicitation of ballots. *See 7 Collier on Bankruptcy* ¶ 1129.03[2] (15th ed. rev.1999); *see also In re Apex Oil Co.,* 118 B.R. 683, 703 (Bankr.E.D.Mo. 1990).

The Official Committee of Unsecured Creditors ("U/S CC") and the Bank of New York asserted that the Proponents did not comply with this provision of the Bankruptcy Code because they did not timely deliver ballots to some of the commercial creditors, and in so doing, failed to properly solicit acceptances of the Plan. But the Bank's and U/S CC's memoranda lacked any argument on this point. As a result, the Proponents similarly did not discuss it in their responsive memorandum. Moreover, neither the Bank nor the U/S CC raised this objection at the confirmation hearing. The Court therefore concludes that they have waived their right to challenge confirmation on this ground.

This situation is analogous to one where a party raises an issue at the trial level but then fails to pursue it on appeal, or where it raises the issue on appeal in a cursory manner with no supporting case law or statutory citations. In either case, the issue not addressed would be deemed waived. It is

the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.... Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990) (internal quotations and citations omitted). *See also United States v. Reed,* 167 F.3d 984, 993 (6th Cir.1999) (relying on *Zannino,* in finding appellant's argument "forfeited" due to its inadequacy); *United States v. Brown,* 151 F.3d 476, 487 (6th Cir.1998); *Gafford v. General Electric Co.,* 997 F.2d 150, 167 (6th Cir.1993); *Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 795 (7th Cir.1989); *Brown,* 151 F.3d at 492 (Gilman, J., concurring in part and dissenting in part) ("[t]he provisions of [Federal] Rule [of Appellate Procedure] 28 are not simply a technical nicety; they have a direct impact on the functioning of the adversary system.").

■ There is no logical reason why the standard for briefing issues at the trial level, where the same concerns apply, should be any lower than at the appellate level. Applying that standard here, it is clear that the U/S CC and the Bank waived any objection based upon allegedly improper solicitation of acceptances because there was no reference to such an argument in their briefs, nor did they make (or even suggest) a showing that manifest injustice would result from a finding of waiver. "The burden on the dockets of the federal courts is severe enough already, without requiring the courts to raise, research, and explain an issue not deemed important enough by the parties to justify mention in their briefs." *Sumner v. Mata*, 449 U.S. 539, 554, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). *See also In re Campbell*, 58 B.R. 506 (Bankr.E.D.Mich. 1986).

■ But even assuming this objection had been pursued, the Court would nevertheless overrule it. The issue raised is one of fact. As there is no record evidence to support the bare allegation that ballots were delivered late to certain members of Class 4, there is no basis for a finding of fact adverse to the Proponents on § 1129(a)(2). What minimal evidence there is supports this Court's finding that the notice, solicitation procedures and balloting were beyond reproach.

■ This objection fails for yet another reason. It was not shown that any deficiency in the solicitation procedures which might have existed in any way prejudiced the outcome of voting or otherwise affected the rights of those parties to whom ballot delivery was allegedly untimely. Class 4 rejected the Plan. Therefore, the harmless error standard of F.R.Civ.P. 61, made available in bankruptcy proceedings by F.R.Bankr.P. 9005, is applicable. By this rule, the Court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." F.R.Civ.P. 61.

Bankruptcy courts, either by applying this standard or by looking to the legislative history of § 1129(a), have refused to deny confirmation of chapter 11 plans based on mere technical or trivial violations of confirmation requirements. One court explained that minor violations of § 1129(a)(2), ought not be viewed as "a 'silver bullet' to kill th[e] Plan," ... [because] "Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code....[I]f Congress had meant that any infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express." *In re Landing Assocs., Ltd.*, 157 B.R. 791, 810–811 (Bankr.W.D.Tex.1993). *See also Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 647 (2d Cir.1988) (refusing to decide if the alleged voting irregularities violated the Bankruptcy Code because they constituted, at most, harmless error and explaining that "[t]he harmless error rule has been invoked in the bankruptcy context where procedural irregularities, including alleged errors in voting procedures, would not have had an effect on the outcome of the case"); *Gilman v. Davis (In re State Thread Co.)*, 126 F.2d 296, 301 (6th Cir.1942) (holding that although "the district judge erred in reversing the referee's action" of permitting the complaining party to vote at the election of the trustee, because such party had not contended that he had suffered any actual injury, he had "been deprived of a mere technical and not a substantial right," and so the error was harmless).

As noted, there is no evidence showing that some ballots were not timely delivered. However, had this been shown, under the circumstances of this case, this would constitute, at most, a harmless error that would not justify denial of confirma-

tion of the Plan. Accordingly, this objection is overruled.[5]

## IV. Plan Complies With Applicable Provisions of Title 11

### A. The Deemed Waivers and Releases

■ A plan cannot be confirmed unless it "complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). Terms in a plan which are neither required nor expressly authorized by the Code are nevertheless permissible under § 1129(a)(1) if they are "appropriate ... [and] not inconsistent with the applicable provisions of" the Code. 11 U.S.C. § 1123(b)(6). *See United States v. Energy Resources,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) "The Bankruptcy Code does not explicitly authorize the bankruptcy courts to approve reorganization plans designating tax payments as either trust fund or nontrust fund. The Code, however, grants the bankruptcy courts residual authority to approve reorganization plans including 'any ... appropriate provision not inconsistent with the applicable provisions of [the Code]....'" (quoting 11 U.S.C. § 1123(b)(5), which has since been recodified as § 1123(b)(6)).

Article Eight of the Plan, entitled "Effects of Plan Confirmation," contains provisions which implicate § 1123(b)(6). Pursuant to § 8.3, personal-injury claims against various parties "are deemed ... waived and released." *Plan* § 8.3. The next section provides that holders of the claims which have been so deemed "shall be permanently enjoined ... from ... commencing or continuing ... any action" seeking to enforce their claims. *Id.* § 8.4.

Clearly, the Code does not mandate that provisions of this sort be included in a plan. And in this context, the Code also does not explicitly authorize the inclusion of such provisions. *Compare* 11 U.S.C. § 524(g) (allowing for substantially the same relief with respect to a non-debtor's liability arising from asbestos exposure). Accordingly, the Plan cannot be confirmed if §§ 8.3 and 8.4 are inconsistent with the Code or otherwise improper.

### Discussion

Sections 8.3 and 8.4 provide:

8.3 *Release* ... [I]n consideration of (a) the promises and obligations of the Debtor–Affiliated Parties under the Plan ..., (b) the undertakings of the Shareholders ..., (c) the undertakings of the Settling Insurers pursuant to their respective settlements with the Debtor, and (d) the release of Claims against the Debtor–Affiliated Parties by the Settling Physicians and Settling Health Care Providers, on the Effective Date (i) all Persons who have held, hold, or may hold Products Liability Claims, whether known or unknown, shall be deemed to have forever waived and released all such rights or Claims, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against the Debtor–Affiliated Parties, the Shareholder–Affiliated Parties, the Settling Insurers, and, to the extent released by the Debtor under the settlement agreements with such Settling Insurers, [parties related to] ... the Settling Insurers, and (ii) all Persons who hold, may hold or may have held Personal Injury Claims shall be deemed to have forever waived and

---

5. Approximately 25 foreign breast implant claimants represented by Sybil Shainwald, P.C., claimed that they did not receive ballots. Although they say that this fact means that *the Plan* does not comply with the applicable provisions of title 11, that makes no sense. The Plan is the Plan; it doesn't disseminate itself. What this objection really states is an attack on the second confirmation standard, § 1129(a)(2).

This objection, like those of the U/S CC and the Bank, was never pursued at the confirmation hearing. It is, therefore, likely that this objection, like the others, were resolved to the satisfaction of the objectors prior to the completion of the hearing. Even if this is not the case, this objection likewise will not be sustained as there was no evidence presented in support of the underlying factual allegation.

released all such rights or Claims, whether based upon tort or contract or otherwise, that they heretofore, now or hereafter possess or may possess against the Settling Physicians (except for Malpractice Claims) or the Settling Health Care Providers (except for Malpractice Claims) ( ... collectively[,] ... the *"Released Parties"*), in each case based upon or in any manner arising from or related to ... [the Debtor's materials and products]

...

The ... Released Parties ... shall be deemed released by the Quebec Class Action Settlement Claimants, the Ontario Class Action Settlement Claimants, the B.C. Class Action Settlement Claimants and the Australia Breast Implant Settlements Claimants, and shall be entitled to receive executed releases pursuant to [such agreements]....

8.4 *Permanent Injunction Against Prosecution of Released Claims* ... [F]or the consideration described in section 8.3 above, on the Effective Date all Persons who have held, hold, or may hold Released Claims, whether known or unknown, ... shall be permanently enjoined on and after the Effective Date from (a) commencing or continuing ... any action ... with respect to any Released Claim against the [Released Parties] ..., the Settlement Facility, [and] the Litigation Facility ... (collectively, the *"Parties"*) or the property of the Parties, (b) seeking the enforcement, attachment, collection or recovery ... of any judgment, award, decree, or order against the Parties or the property of the Parties, with respect to any Released Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Parties or the property of the Parties with respect to any Released Claim, (d) asserting any setoff, right of subrogation, or recoupment of any kind

against any obligation due to the Parties with respect to any Released Claim, and (e) taking any act ... that does not conform to or comply with provisions of this Plan, or the Settlement Facility Agreement and the Litigation Facility Agreement....

*Plan* §§ 8.3 and 8.4. *See id.* § 1.59 ("*'Effective Date'* means the first Business Day (a) that is at least 11 days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which all conditions to effectiveness of this Plan have occurred or been waived.").

Among the so-called "Released Parties" are the Debtor [6] and its shareholders, The Dow Chemical Company and Corning, Inc. *See id.* §§ 1.47, 1.163, 1.165. Other beneficiaries of §§ 8.3/8.4 include insurance companies that the Debtor released from claims pursuant to settlement agreements, and health-care providers in Classes 12 and 13 who settle their respective claims against the Debtor. *See id.* §§ 1.159, 1.160 and 1.162.

■ Before considering whether these provisions are permissible, we must ascertain their meaning. To assist us in that task, we will invoke rules of construction applicable to contracts and statutes. *See generally, e.g., In re Texas Gen. Petroleum Corp.,* 52 F.3d 1330, 1335 (5th Cir. 1995) ("We apply the rules of contract interpretation to the interpretation of a plan of reorganization."); *In re Beta Int'l, Inc.,* 210 B.R. 279, 285 (E.D.Mich.1996) ("Interpretation of a Chapter 11 plan is basically a matter of contractual interpretation."); *see also Pennsylvania R.R. Co. v. Chesapeake & Ohio R.R. Co.,* 229 F.2d 721, 727 (6th Cir.1956) ("[T]he same principles of statutory construction derived from [the cited cases] ... applies [sic] to the interpretation of contracts ....").

We begin our analysis of § 8.3 with consideration of the verb "deem," which sim-

---

**6.** Most personal-injury claims against the Debtor are to be paid by a "Litigation Facility" or a "Settlement Facility," both estab- lished and funded by the Debtor. *See Plan* § 6.11.3.

ply means "to hold as an opinion" or to "regard." *Random House College Dictionary* (rev. ed.1980). *See generally, e.g., Klamath Water Users Protective Ass'n v. Patterson,* 191 F.3d 1115, 1119 (9th Cir. 1999) ("Contract terms are to be given their ordinary meaning ...."). Section 8.3 does not specify just who is to "regard" the claims in question as having been waived or released. But of course, the only "opinion" on the subject which ultimately matters is that of judges called upon to make a ruling as to whether a claim remains enforceable. Thus we infer that what § 8.3 really means is that *the courts* shall deem the claims to be waived and/or released. And particularly since the Plan contemplates a permanent injunction, we also infer that the first court to do the "deeming" is this one. *Cf. In re Dore & Assocs. Contracting, Inc.,* 43 B.R. 717, 720 (Bankr.E.D.Mich.1984) (where this Court rejected the "argu[ment]" that the mere confirmation of the plan effected a *de facto* permanent injunction").

Next we consider the words "release" and "waiver." The latter term is defined as "[t]he voluntary relinquishment or abandonment—express or implied—of a legal right." *Black's Law Dictionary* (7th ed.1999). Similarly, a "release" is "the act of giving up a right or claim to the person against whom it could have been enforced." *Id.* In effect, then, the Plan would have the Court make a finding that the holders of claims affected by § 8.3 have opted not to pursue those claims.

This brings us to the question of just which claim holders are in fact "affected." According to the literal terms of § 8.3, the waiver/release covers "all [such p]ersons," without distinction. However, an alternative construction is suggested by § 8.1, which provides that "any Claim [against the Debtor is discharged] ..., *whether or not ... the holder of such Claim has accepted this Plan.*" *Plan* § 8.1 (emphasis added). Section 8.3, which begins on the same page as § 8.1 and is part of the same Article Eight, contains no such language.

Thus the implication is that Plan acceptance—while irrelevant to the scope of the discharge—*does* have a bearing on whether a person is to be deemed by the Court to have waived or released her claim. *Cf. Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)). And as will be seen, a narrow construction of § 8.3 makes sense for other reasons.

▪ "[I]n the interpretation of a promise or agreement[,] ... an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]" *Restatement, Second, Contracts* § 203(a). *See also, e.g., Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd[ ] has long been a judicial function."); *Williamson v. Kay (In re Villa West Assocs.),* 146 F.3d 798, 803 (10th Cir.1998) (Under Kansas law, " '[r]easonable rather than unreasonable interpretations of contracts are favored,' and '[r]esults which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided.' " (citations omitted)); *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1468 (D.C.Cir.1997) ("[A]mbiguity should be resolved in favor of a legal construction of the parties' agreement ...."); *Catalina Enters. Incorporated Pension Trust v. Hartford Fire Ins. Co.,* 67 F.3d 63, 66 (4th Cir.1995) (" It is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available."); *id.* (citing a case for the proposition that "when [a contract] provision is susceptible to more than one meaning, a

738

fair and reasonable construction ... should always be favored over one that leads to [a] harsh and unreasonable result"); *Sporting Club Acquisitions, Ltd. v. Federal Deposit Ins. Corp.*, No. 94–1567, 1995 WL 694128, at * 3 (10th Cir. Nov. 24, 1995) (unpublished) ("[U]nder a longstanding principle of construction, FDIC's interpretation of the contract, [if] ... unlawful, should be rejected in favor of the legal alternative proposed by SCA." (citing Colorado case law)); *United States v. Fidelity & Deposit Co.*, 10 F.3d 1150, 1154 (5th Cir.1994) ("Any other construction [of the bond] would be nonsensical under federal law, as such constructions would require us either to rewrite the bond or to make the bond conflict with federal law."); *id.* at 1154 n. 14 (citing cases for the proposition that "contractual language is interpreted whenever possible to uphold the validity of the contract," and "that reasonable doubt about the construction of a contract should be resolved in favor of legality"). For the reasons explained below, the scope of §§ 8.3 and 8.4 must be limited to accepting creditors if these provisions are to be given "reasonable, lawful, and effective meaning." *Restatement, Second, Contracts* § 203(a).

### 1. Consistency with the Code

As noted, § 1123(b)(6) requires a finding that the provision in question is "not inconsistent with" the Code. With that requirement in mind, we consider § 524(g).

A product of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 524(g) outlines the circumstances under which "a court that enters an order confirming a plan of reorganization under chapter 11 may issue ... an injunction ... to supplement the injunctive effect of [the debtor's] ... discharge." 11 U.S.C. § 524(g)(1)(A). This injunction "may bar any action directed against" non-debtor parties to recover certain claims that, under the terms of the plan, are to be paid by a trust. 11 U.S.C. § 524(g)(4)(A)(ii); *see* 11 U.S.C. § 524(g)(1)(B). Thus it is clear that the

relief which would be afforded the Released Parties by §§ 8.3 and 8.4 of the Plan is substantially the same as the relief available under § 524(g). *Cf. American Hardwoods, Inc. v. Deutsche Credit Corp.*, (*In re American Hardwoods, Inc.*), 885 F.2d 621, 626 (9th Cir.1989) (rejecting the debtor's "semantic distinction" between "a permanent injunction against the enforcement of a judgment ... [and a bankruptcy] discharge").

■ This fundamental sameness is significant because § 524(g) spells out very detailed requirements which must be met before a "supplemental injunction" can issue. *See* 11 U.S.C. § 524(g)(2)(B). Those requirements obviously are not satisfied here. Yet there clearly is no conflict with § 524(g) if the reach of §§ 8.3 and 8.4 is limited to accepting creditors because § 524(g) describes the conditions which must be met before an *unwilling* creditor can be enjoined from pursuing non-debtor parties. It does not by its terms preclude a creditor from agreeing to forgo its right of recovery against such parties. And since those creditors who accepted the Plan have in substance done just that, *see infra* pp. 740–41, §§ 8.3/8.4 do not contravene § 524(g) if narrowly construed. *Cf. In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr.D.N.J.1997) ("A voluntary, consensual release is not a discharge in bankruptcy."); Judith R. Starr, *Bankruptcy Court Jurisdiction to Release Insiders from Creditor Claims in Corporate Reorganizations*, 9 Bankr.Dev. J. 485, 487 (1993) ("A discharge is an *involuntary* release of creditor claims against an entity (both asserted and unasserted) enforced by the court." (emphasis added)).

On the other hand, a broad construction of §§ 8.3 and 8.4 would seem to be at odds with § 524(g). After all, confirmation of a plan so construed would mean that the Proponents were able to obtain the (nonconsensual) "supplemental injunction" which § 524(g) permits, without satisfying that statute's prerequisites. Ordinarily, courts would reject this as a blatant at-

tempt to circumvent the statute. *Cf., e.g., Moran v. Aetna Life Ins. Co.,* 872 F.2d 296, 301 (9th Cir.1989) ("Congress has expressly limited the persons who may be sued under [29 U.S.C.] section 1132(c). We cannot make an end run around the statute by creating an additional class of persons liable. . . .").

It seems, however, that we are not dealing with an "ordinary" statute. Along with § 524(g), Congress enacted a "Rule of Construction" which states that "[n]othing in [§ 524(g)] . . . shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Pub.L. 103–394 § 111(b) (uncodified). The legislative history sheds light on this rather odd rule:

> Section 111(b) . . . make[s] clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan [of] reorganization. Indeed, [asbestos suppliers] Johns–Manville and UNR firmly believe that the court in their cases had full authority to approve the trust/injunction mechanism. And other debtors in other industries are reportedly beginning to experiment with similar mechanisms. The Committee expresses no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind. The Committee has decided to provide explicit authority in the asbestos area because of the singular cumulative magnitude of the claims involved. How the new statutory mechanism works in the asbestos area may help the Committee judge whether the concept should be extended into other areas.

Vol. E., *Collier on Bankruptcy,* at App. Pt. 9–78 (reprinting legislative history pertaining to the 1994 Code amendments). ▮ Thus the rule "was apparently intended to prevent a negative implication from being drawn from the fact that the amendments deal only with asbestos-related cases." *Id.* Vol. 4, at ¶ 524.07[2]. So while the text of § 524(g) indicates that the statute governs *all* chapter 11 reorganizations, it seems that the congressional "Rule of Construction" obliges us to regard § 524(g) as irrelevant to non-asbestos cases. *See* P. Meltzer, *Getting Out of Jail Free: Can the Bankruptcy Plan Process Be Used to Release Nondebtor Parties?,* 71 Am. Bankr.L.J. 1, 31 (Winter, 1997) (*"Getting Out of Jail"*) ("In view of the [Rule of Construction] . . ., it can certainly be argued that the enactment of § . . . 524(g) . . . provides no guidance as to issues not involving asbestos liability . . . ."). On the strength of the rule, then, we conclude that the Plan is not inconsistent with § 524(g) even if §§ 8.3 and 8.4 apply to non-accepting creditors.

Whether broadly or narrowly construed, §§ 8.3 and 8.4 do not run afoul of § 524(e). This statute provides that, with an exception not relevant here, the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Some courts assert that § 524(e) prohibits judicial extension of the discharge to non-debtor parties. *See, e.g., Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394, 1401 (9th Cir.1995); *In re Future Energy Corp.,* 83 B.R. 470, 486 (Bankr.S.D.Ohio 1988).

Support for this assertion is provided by § 524(g), which as indicated earlier allows for entry of what amounts to a discharge of asbestos-related claims against a non-debtor. The Code informs us that such a discharge may enter "[n]otwithstanding the provisions of section 524(e)." 11 U.S.C. § 524(g)(4)(A)(ii). This clause suggests that, except as authorized by § 524(g), a non-debtor discharge is precluded by § 524(e).

▮ We believe, however, that the cases cited read too much into § 524(e).

This statute simply provides in effect that a third party's liability is not discharged by virtue of a discharge of the debtor's liability. It does not by its terms preclude a court from discharging the liability of a third party. The better view, then, is that entry of a non-debtor injunction—regardless of whether it is consensual—is not incompatible with § 524(e). *See, e.g., In re Specialty Equip. Cos.*, 3 F.3d 1043, 1045–47 (7th Cir.1993); *In re Digital Impact*, 223 B.R. 1, 10 (Bankr.N.D.Okla.1998); *In re West Coast Video Enters.*, 174 B.R. 906, 910–11 (Bankr.E.D.Pa.1994); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 687 (Bankr.D.D.C.1992). Section 524(g)'s "notwithstanding" clause is therefore unnecessary, and probably reflects nothing more than an excess of caution on the part of its drafters. *Cf. Western Union Tel. Co. v. FCC*, 665 F.2d 1126, 1138 (D.C.Cir.1981) ("Congress may have added the proviso merely [for] ... clarif[ication].... It is true that such a proviso was not absolutely necessary, but clarifying language is never absolutely necessary.").

▪ For the reasons stated, neither § 524(e) nor § 524(g) precludes a court from granting non-debtor discharges. And there is no other Code provision which speaks to the issue. Accordingly, we conclude that §§ 8.3 and 8.4 are not inconsistent with the Code even if they apply to creditors who did not accept the Plan.[7] But as explained in Part 2 below, these provisions are inconsistent with other law if they encompass non-accepting creditors.

## 2. Compliance With Non–Bankruptcy Law

▪ We could not confirm the Plan unless § 8.3 is "appropriate" for purposes of § 1123(b)(6). *See, e.g., State of Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777, 785 (4th Cir.1997). In essence, then, "propriety" turns on wheth-

er these provisions are compatible with non-Code law. *See Energy Resources*, 495 U.S. at 550, 110 S.Ct. 2139 ("Even if consistent with the Code, ... a bankruptcy court order might be inappropriate if it conflicted with another law that should have been taken into consideration in the exercise of the court's discretion.") As will be explained, a Plan provision which would require the Court to "deem" that non-accepting creditors have released their claims is contrary to basic legal principles, and is therefore inappropriate.

The verb "deem" is often used to establish what amounts to a legal fiction. *See generally Black's Law Dictionary* (7th ed. 1999) ("'[D]eem' ... [means t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it doesn't have"). But a non-fact cannot properly be transformed into a fact simply to suit a litigant's wishes. Rather, there has to be some foundation for pretending that that which is not, is (or vice versa):

> [W]hen we engage in a fiction, we redefine reality to comport with existing law as a method of changing the law to meet new realities.... This method of adapting the law to changing circumstances and perceptions is saved from absurdity by its underlying rationality.... [W]hen used properly the legal fiction is a rule of law embodying an unconcealed falsehood at one level and a deeper truth at another more important level. *The falsehood is often made necessary because of the preexisting structure of the law, and is justified* (if it is justified) *by the deeper underlying truth contained within the falsehood.*

John A. Miller, *Liars Should Have Good Memories: Legal Fictions and the Tax Code*, 64 U. Colo. L.Rev. 1, 26 n. 109 (1993) (emphasis added). *See also Pettibone Corp. v. Easley*, 935 F.2d 120, 123 (7th Cir.1991) ("Even legal fictions have their limits.").

---

**7.** Of course, preconfirmation claims against the Debtor are discharged in any event. *See* 11 U.S.C. § 1141(d)(1); *Plan* § 8.1. Thus, in-

sofar as the waiver/release pertains to such claims, it is not just compatible with the Code; it is rendered superfluous by it.

Such a "foundation" exists insofar as accepting creditors are concerned. By voting in favor of the Plan, these creditors have manifested an intention to accept the rights granted to them under the terms of the Plan in lieu of whatever rights they may have against the Released Parties. *See Specialty Equip.*, 3 F.3d at 1047 ("[A] consensual release ... binds only those creditors voting in favor of the plan of reorganization."); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr.D.Del.1999) (A release of third parties "cannot be accomplished without the affirmative agreement of the creditor affected."); *West Coast Video*, 174 B.R. at 911 ("[E]ach creditor bound by the terms of the release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise."). *But see, e.g., Star Phoenix Mining Co. v. West One Bank*, 147 F.3d 1145, 1147 (9th Cir.1998) "[A] creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings." (quoting *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1351 (5th Cir.1989), which was in turn quoting *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982) (per curiam), *overruled by Specialty Equip.*, 3 F.3d at 1045–47); *Arrowmill Dev.*, 211 B.R. at 507 ("[I]t is not enough [to establish the validity of a creditor's release in favor of a non-debtor party] for [the] ... creditor ... to simply vote 'yes' as to a plan."). So even though there has been no formal release or explicit waiver, there is a reasonable basis for "deeming" otherwise.

With respect to non-accepting creditors, however, that basis is lacking. Certainly a creditor who affirmatively voted to reject the Plan cannot *fairly* be characterized as having "voluntarily" relinquished her rights against the Released Parties. *See generally Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 92, 55 S.Ct. 50, 79 L.Ed. 211 (1934) ("[L]egal fictions have an appropriate place in the administration of the law when they are required by the demands of convenience and *justice*." (em-

phasis added)); *In re Chalasani*, 92 F.3d 1300, 1303 (2d Cir.1996) ("A legal fiction assumes as fact, *for purposes of justice*, that which does not exist." (emphasis added)). And even the inaction of those creditors who cast no vote on the Plan is too ambiguous to warrant the inference that substantive rights have been surrendered. *See Arrowmill Dev.*, 211 B.R. at 507 (The "creditor ... did not vote for the plan and clearly did not manifest any assent to have his claim against [the non-debtor party] ... released."); *see generally, e.g., Peoples Bank & Trust Co. of Madison County v. Aetna Cas. & Surety Co.*, 113 F.3d 629, 638 (6th Cir.1997) ("Kentucky cases have recognized the rule found in other states that a finding of implied waiver requires a 'clear, unequivocal, and decisive act showing an intention to relinquish the right.'" (citations omitted)); *United States v. Amwest Surety Ins. Co.*, 54 F.3d 601, 602–03 (9th Cir.1995) ("An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved." (citation omitted)).

■ Put simply, then, non-bankruptcy law recognizes a basis for "deeming" only that *accepting* creditors have agreed to give up their rights against the Released Parties. The extension of this "legal fiction" to creditors who did not accept the Plan would be unreasonable and, as to creditors who affirmatively rejected the Plan, patently absurd and unjust. It is also unlawful, and therefore of no effect. *See Specialty Equip.*, 3 F.3d at 1047 (quoted *supra* pp. 740–41); *West Coast Video*, 174 B.R. at 911 ("[T]he releases of non-debtors included in the Plan cannot be enforced against the Movants. Clearly, the Movants did not cast a vote in favor of the Plan or otherwise affirmatively agree to release the Debtor's principals in connection with this case.").

This whole issue of consent would arguably be moot if we had the power to enjoin creditors (against their will) from pursuing

claims against the Released Parties. And there is support for the view that courts have such authority under § 105(a), which states: "The court may issue any order ... that is necessary or appropriate to carry out the provisions of th[e Code]...." 11 U.S.C. § 105(a). *See, e.g., Munford, Inc. v. Munford (In re Munford, Inc.)*, 97 F.3d 449, 454–55 (11th Cir.1996); *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 701–02 (4th Cir.1989) ("*Robins I*"); *In re Johns–Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir.1988); *In re Optical Technologies, Inc.*, 216 B.R. 989, 994 (Bankr.M.D.Fla.1997); *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 934 (Bankr. W.D.Mo.1994); *Heron*, 148 B.R. at 685.

■■■■ It is clear from the text of § 105(a), however, that a court's authority thereunder must derive from whatever (other) Code provision the § 105(a) order is designed to "carry out." As explained by the Fifth Circuit, § 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986) (footnote omitted). *See also In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 825 (S.D.Ohio 1998) ("[Section] 105, standing alone, cannot serve as a source of authority for granting a permanent injunction [barring creditors from pursuing claims against a non-debtor]."); *In re Sybaris Clubs Int'l, Inc.*, 189 B.R. 152, 155 (Bankr.N.D.Ill.1995) ("Section 105 ... is merely a vehicle to carry out the otherwise provided powers of the bankruptcy court."); Meltzer, *Getting Out of Jail*, 71 Am. Bankr.L.J. at 18 ("[Section] 105(a) ... should be construed ... narrowly, namely as a limited grant of power to bankruptcy judges to take only those actions which are in furtherance of a specific provision already in the Code."). The Supreme Court implicitly recognized the ancillary nature of § 105(a), stating that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

Thus if there is authority to in effect grant a discharge of debts owed by a non-debtor party, it must be found not in § 105(a) but elsewhere. This search has led courts to various Code provisions. *See, e.g., Johns–Manville*, 837 F.2d at 93–94 (11 U.S.C. § 363(f)); *Potasky*, 222 B.R. at 826 n. 16 and accompanying text (11 U.S.C. §§ 1123(b)(3)(A) and/or 1141(c)). However, none of these provisions is on point—an obvious fact which is only reinforced by comparison with § 524(g), a statute which *is* on point. *See* Vol. E., *Collier on Bankruptcy*, at App. Pt. 9–78 (reprinting legislative history pertaining to § 524(g)) ("The Committee expresses no opinion as to how much authority a bankruptcy court may generally have *under its traditional equitable powers* to issue an enforceable injunction of this kind.... How the new *statutory* mechanism [established by § 524(g)] works in the asbestos area may help the Committee judge whether the concept should be extended into other areas." (emphasis added)); *cf. City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) ("[T]his [statutory] provision 'shows that Congress knew how to draft a waste stream exemption ... when it wanted to.'" (citation omitted)).

A non-statutory theory advanced in support of this kind of injunction is based on "the ancient but very much alive doctrine of marshalling of assets." *Robins I*, 880 F.2d at 701. The Fourth Circuit explained: "A creditor has no right to choose which of two funds will pay his claim. The bankruptcy court has the power to order a creditor who has two funds to satisfy his debt to resort to the fund that will not defeat other creditors." *Id.* This theory is flawed on two levels.

Assuming for the sake of argument that the non-debtor injunction really is "analogous" to a marshaling injunction, *id.*, then

restrictions associated with use of the latter form of injunction would presumably also be applicable to the former. One such restriction is that the party to be enjoined cannot be prejudiced by the injunction. *See In re Atlas Commercial Floors, Inc.,* 125 B.R. 185, 188 (Bankr.E.D.Mich.1991) and cases cited therein. Yet where liability is capped, as in this case, *see Plan* § 6.11.3; *Amended Joint Disclosure Statement* ¶ 1.1(E), the enjoined creditors *are* prejudiced because, as the Nevada Claimants perhaps irrationally fear, there is some, albeit slight, possibility that they will not obtain full recovery from the Reorganized Debtor.

It could be argued in response that this incremental risk of less-than-full recovery is insignificant. *See supra* pp. 729–32. But whatever the level of risk, the *equitable* solution (and marshaling, of course, is grounded in equity) would be to grant only a provisional injunction—one which terminates if and when the "primary" fund is exhausted. Indeed, that is precisely what a marshaling injunction would do. *See C.T. Dev. Corp. v. Barnes (In re Oxford Dev. Ltd.),* 67 F.3d 683, 687 (8th Cir.1995) (Under the "federal marshaling doctrine," the enjoined party "may be required to exhaust the fund available to him exclusively *before proceeding against the [second] fund.*" (emphasis added; citation omitted)). An injunction which permanently bars creditors from seeking compensation from the "secondary" payment source is neither equitable nor consistent with the objectives of a marshaling injunction.

As indicated, the foregoing criticism is based on the assumption that a marshaling injunction serves as a suitable analogy to the non-debtor injunction at issue in this and similar cases. That assumption, however, does not withstand analysis.

Stated more fully, "[t]he equitable doctrine of marshalling ... rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, *who may resort to only one of the funds.*" *Meyer v. United States,* 375 U.S. 233, 236, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963) (emphasis added) (citation omitted). That is manifestly *not* the purpose of a non-debtor injunction: Courts issuing such an injunction are not doing so to protect a subset of creditors whose only recourse is against the non-debtor obligor.

In an apparent attempt to supply the element of creditor protection, and thereby shore up its marshaling-doctrine analogy, the Fourth Circuit explained that the non-debtor injunction serves to prevent recalcitrant creditors from "interfer[ing] with the reorganization and thus with all the other creditors." *Robins I,* 880 F.2d at 702. This objective may be commendable, but of course it is not even remotely similar to the policy underlying the marshaling doctrine.

Like *Robins I,* other courts have defended the non-debtor injunction as a means of facilitating the plan negotiation/confirmation process. *See, e.g., Johns–Manville,* 837 F.2d at 93–94; *see generally* Ralph Brubaker, *Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non–Debtor Releases in Chapter 11 Reorganizations ("Bankruptcy Injunctions"),* 1997 U. Ill. L.Rev. 959, 1009 (1997) ("[T]he paramount concern of courts that approve non-debtor releases is a stated policy favoring reorganizations."). But even if one accepts the premise that confirmation really is the "congressionally preferred" outcome in chapter 11, it does not follow that a court has the authority to invent equitable solutions designed to achieve that objective. *Cf.* Meltzer, *Getting Out of Jail,* 11 Am. Bankr.L.J. at 18 ("[T]here is no mandate in the Code telling bankruptcy judges to do whatever is necessary to confirm plans, or giving them freewheeling authority to try and maximize the number of Chapter 11 cases that result in confirmed plans.").

To the contrary, the circumstances under which a federal court can

744

"play the equity card" are precisely (and rather narrowly) defined:

> [E]quity is flexible; but in the federal system, at least, that *flexibility is confined within the broad boundaries of traditional equitable relief.* To accord a type of relief that has never been available before ... is to invoke a "default rule," [citation to dissenting opinion] ..., not of flexibility but of omnipotence. When there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than we both to perceive them and to design the appropriate remedy.
>
> ...
>
> [R]esolving ... [the arguments for and against recognition of the equitable relief at issue] in this forum is incompatible with the democratic and self-deprecating judgment we have long since made: that the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence.
>
> ...
>
> "If ... a Court of Equity in England did possess the unbounded jurisdiction, which has been thus generally ascribed to it, of correcting, controlling, moderating, and even superceding [sic] the law, and of enforcing all the rights, as well as the charities, arising from natural law and justice, and of freeing itself from all regard to former rules and precedents, it would be the most gigantic in its sway, and the most formidable instrument of arbitrary power, that could well be devised. It would literally place the whole rights and property of the community under the arbitrary will of the Judge, acting, if you please, *arbitrio boni judicis,* and it may be, *ex aequo et bono,* according to his own notions and conscience; but still acting with a despotic and sovereign authority."

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319, 333, 339 (1999) (emphasis added; quoting J. Story, 1 Commentaries on Equity Jurisprudence § 19, at 21).

*Grupo Mexicano* distinguished one of the Court's prior decisions on the grounds that the plaintiff was seeking equitable (rather than legal) relief, and another of its decisions because a public (rather than strictly private) interest was implicated. *See id.* at 335, 119 S.Ct. 1961. On the basis of these distinctions, it could be argued that bankruptcy courts can be more "creative" in fashioning equitable remedies than could a federal court presiding over a legal, private dispute. *See generally Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) ("[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, ... may well be a 'public right'...."); *see also, e.g., In re Jarvis,* 53 F.3d 416, 419 (1st Cir. 1995) ("Bankruptcy courts ... are courts of equity, traditionally governed by equitable principles.").

That proposition, however, cannot easily be reconciled with pronouncements of the Supreme Court and Sixth Circuit on the subject of a bankruptcy judge's equitable discretion. *See Ahlers,* 485 U.S. at 206, 108 S.Ct. 963 (*quoted supra* p. 742); *In re Granger Garage, Inc.,* 921 F.2d 74, 77 (6th Cir.1990) (paraphrasing *Ahlers* and adding that "[a] bankruptcy court does not have unfettered equity powers"). Therefore, unless and until either of these courts rules otherwise, we assume that the mode of analysis in *Grupo Mexicano* applies with equal force in the bankruptcy realm.

■ In our view, the ground rules laid down by *Grupo Mexicano* preclude the granting of a non-debtor injunction. Absent creditor consent, such an injunction is tantamount to forcing that creditor to accept terms that she considers to be unacceptable. *See* Brubaker, *Bankruptcy Injunctions,* 1997 U. Ill. L.Rev. at 966

(describing this injunction as a "nonconsensual settlement"). It is an "extraordinary" remedy, one which is "unheard of in any other context." *Id.* By no means, then, can such an injunction be described as a form of "traditional equitable relief." *Grupo Mexicano*, 527 U.S. at ——, 119 S.Ct. at 1969, 144 L.Ed.2d at 333. Resort to this "remedy" therefore constitutes the exercise of a power which federal courts simply do not possess. *See id.* at 339–40, 119 S.Ct. 1961; *see also* Brubaker, *Bankruptcy Injunctions*, 1997 U. Ill. L.Rev. at 1010 (The proposition that "a bankruptcy judge can unilaterally override legitimate policies embodied in nonbankruptcy law that would place liability upon the released non-debtors ... is hard to square with the inherent limitations of the judicial process and Congress' primary role in making such policy determinations in the bankruptcy context.").

For these reasons, we conclude that a bankruptcy court has no authority, statutory or otherwise, to issue a non-consensual permanent injunction in favor of non-debtor parties. Thus the absence of legitimate grounds for inferring that a creditor has consented to entry of such an order cannot be dismissed as "harmless error."

### 3. Sections 8.3 and 8.4 are Permissible Because They Apply Only to Accepting Creditors

 As explained above, §§ 8.3 and 8.4 are not inconsistent with § 1123(b)(6) only if construed as applying solely to creditors who voted to accept the Plan. A broader construction of these provisions, besides contravening § 1123(b)(6), would produce results which are at best unreasonable (if applied to nonvoting creditors) and at worst absurd and unjust (if applied to creditors who actively opposed the Plan). These facts counsel against a broad construction of §§ 8.3 and 8.4.

Of course, we could not reject such a construction if it were plain from the terms of the Plan. Under such circumstances, we would have no choice but to deny confirmation of the Plan. *See* 11 U.S.C. §§ 1123(b)(6), 1129(a)(1); *see also supra* Part 2. It is *not* clear, however, that §§ 8.3 and 8.4 apply without distinction to all persons holding claims of the type described therein. Indeed, it is entirely plausible that the provisions relate solely to those persons who accepted the Plan. *See supra* pp. 21–24. The latter construction is the more sensible, and the one which we adopt. So construed, §§ 8.3 and 8.4 are "appropriate" and "not inconsistent with" the Code. 11 U.S.C. § 1123(b)(6). *See supra* Parts 1 and 2. Therefore, inclusion of these provisions in the Plan does not constitute grounds for denying confirmation.

### 4. Permanent Injunctive Relief

As indicated earlier, holders of claims against the Released Parties are to be "permanently enjoined" from collecting those claims. *Plan* § 8.4. The basis for this relief is the "deemed" waiver or release of such claims pursuant to § 8.3. *See id.* Thus the reach of § 8.4 is coextensive with § 8.3—both provisions apply only to those creditors who accepted the Plan.

Since creditors who accepted the Plan have essentially agreed to relinquish their claims against the Released Parties, one could certainly question the need for an injunction. *See generally, e.g., Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir.1998) ("[T]o obtain ... a ... permanent injunction, plaintiffs must demonstrate that failure to issue the injunction is likely to result in irreparable harm."). But as these creditors also implicitly consented to the granting of injunctive relief, we assume that they have waived whatever arguments might be made in opposition to such relief.

### 5. Postscript

The Court is mindful of the fact that the release/injunction provisions are perceived by the Debtor and affiliated parties as being of critical importance. In that re-

gard, it is well to bear in mind that, by their own voluntary act, the overwhelming majority of personal-injury claimants are barred from bringing or pursuing claims against the Released Parties.

Nor is there any reason to assume that the Released Parties will be unduly burdened by those claims which are not barred. For one thing, the absolute number of such claims is small in comparison to what the Debtor and the Released Parties faced pre-petition. Moreover, the vast majority of non-barred claims are already pending before Judge Hood in the Eastern District of Michigan. From a practical standpoint, the consolidation of these claims into a single forum greatly simplifies the task of defending against them. And if Judge Hood sees fit, trial could be deferred until Litigation–Facility proceedings have concluded, thereby providing the Released Parties with the functional equivalent of a temporary (but potentially very lengthy) injunction. Alternatively, actual injunctive relief may be warranted if administration of the Plan is unduly burdened by continued prosecution of the non-barred claims. *Cf. Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re Dow Corning Corp.),* 86 F.3d 482, 494 (6th Cir.1996) ("The potential for Dow Corning's being held liable to the non-debtors in claims for contribution and indemnification . . . establish[es] a conceivable impact on the estate in bankruptcy. Claims for indemnification and contribution . . . obviously would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's ability to resolve its liabilities and proceed with reorganization.").

■ On the subject of injunctions, it should also be remembered that the highly-prized (or much-dreaded) adjective "permanent" is something of a misnomer. As the Eight Circuit noted, "[i]t is well settled that a district court retains authority under . . . [F.R.Civ.P.] 60(b)(5) to modify or terminate a continuing, permanent injunction if the injunction has become illegal or changed circumstances have caused it to operate unjustly." *Association for Retarded Citizens of North Dakota v. Sinner,* 942 F.2d 1235, 1239 (8th Cir.1991). *See also In re Hendrix,* 986 F.2d 195, 198 (7th Cir.1993) ("[A] court can modify an injunction that it has entered whenever the principles of equity require it do so."); *cf. King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 418 F.2d 31, 35 (2d Cir.1969) ("[T]here is power to modify an injunction even in the absence of changed conditions. . . ."). So, even if this Court had granted the Proponents an injunction against non-consenting creditors, the Court would retain the discretion to terminate the injunction so that involuntarily-shortchanged creditors can recover any deficiency from one or more of the Released Parties if the Litigation Facility proved to be inadequately funded. *See United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (Even a consensual injunction may be "modif[ied] . . . in adaptation to changed circumstances."). And if this were to happen, whatever incremental benefit the Released Parties would have derived from an all-encompassing injunction would of course be nullified.

Finally, we point out that we previously made factual findings which some courts regard as pertinent to the validity of a non-debtor injunction. *See Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization,* at ¶¶ 21—25. *See In re A.H. Robins Co.,* 880 F.2d 709, 749 (4th Cir. 1989); *Robins I,* 880 F.2d at 702; *Johns–Manville,* 837 F.2d at 94; *Drexel Burnham Lambert,* 960 F.2d at 293; *Master Mortgage,* 168 B.R. at 935; *Heron,* 148 B.R. at 685, 689.[8] Our purpose in doing so

---

**8.** According to the cases upon which the Proponents rely, a court may enter a permanent post-confirmation injunction if these factors exist: (i) the third party has made an important contribution to the reorganization; (ii) the release and injunction are essential or

is to obviate the need for remand in the event we are reversed on appeal with regard to the scope and permissibility of the release/injunction provisions. Another alternative is present. This Court demurs from entry of a broader injunction solely out of a belief that the law will not permit it. Judge Hood may be persuaded to withdraw the reference as to this issue and decide the matter differently. In such a case, the broader injunction may issue from the District Court as an original matter.

### B. Objections of the Pennsylvania Breast Implant Claimants

Jacqueline M. and Mark S. Toledo and Azure and Gary Verruni, as representatives of a group of claimants they refer to as "the Pennsylvania Claimants," objected to confirmation of the Plan. These objections related to the release provisions referred to above but specifically as they affect the lawsuits of the Pennsylvania Claimants against Pennsylvania physicians and other health care providers.

These objections were timely filed in April. But they were unaccompanied by a brief. On February 18, 1999, the Court had fixed April 26, 1999 as the deadline for the filing of memoranda in support of all objections. *See Scheduling Order No. 1 Regarding Confirmation Hearing.* The Pennsylvania Claimants filed no pre-trial memorandum at all, and they did not participate at the confirmation hearing. On September 8, 1999, over a month after the close of proofs and closing arguments, the Pennsylvania Claimants filed their "Memorandum of Law of the Pennsylvania Breast Implant Personal Injury Claimants in Support of Objections to Confirmation of the Amended Joint Plan of Reorganization." Clearly, this brief was untimely, and ought to be disregarded. One could also conclude that their failure to prosecute their objections was tantamount to a waiver. But their memorandum argued nothing new or different from what they asserted originally. And inasmuch as the arguments are unavailing in any event, we will consider them now.

It is difficult to cubbyhole their objections. In one breath they seem to be making an argument similar to that of the Nevada Claimants—that they are special because they have rights that personal injury claimants in other states lack. *See Memorandum of Law of the Pennsylvania Breast Implant Personal Injury Claimants* at 11 ("Pennsylvania law on informed consent differs significantly from those

---

important to the reorganization; (iii) a large majority of the impacted creditors has approved the plan containing the release and injunction; (iv) there is a close connection between the claims against the third party and the claims against the debtor; and (v) the plan provides for payment of substantially all of the claims affected by the release and injunction. Given all that precedes this, though, it is obvious that this Court believes that the factors more-or-less invented by these courts are irrelevant. If a court has no power to grant a form of relief, there are no factors which can justify it. Moreover, a couple of these findings seem largely pointless.

One, the "important-contribution" factor, *see Findings of Fact* at ¶ 21, is too vague to be useful. It also begs the more appropriate question, which is whether the "contribution[ ] ... approximate[s] the value of the released claims." Brubaker, *Bankruptcy Injunctions,* 1997 U. Ill. L.Rev. at 992.

The other dubious factor goes to whether the non-debtor injunction is "important" to the reorganization effort. *Memorandum of Dow Corning Corporation and the Official Committee of Tort Claimants in Support of Confirmation and in Response to Objections to Confirmation,* filed June 1, 1999, at 3 (citing *Drexel Burnham Lambert,* 960 F.2d at 293). Again, this adjective is virtually meaningless because it can be so easily manipulated. Courts have unsurprisingly already slid down the slope to liberalize this "standard." *See* Brubaker, *Bankruptcy Injunctions,* 1997 U. Ill. L.Rev. at 1021–22 & nn. 226–227. Indeed, "[i]f the reorganization policy is reduced to a simple estate-maximizing principle, then all that is required for approval of non-debtor releases is some contribution to the estate by the released non-debtor." *Id.* at 1019. A better formulation, and one which this Court adopted, *see Findings of Fact* at ¶ 22, would consider whether the injunction is "*essential* to reorganization." *Master Mortgage,* 168 B.R. at 935 (emphasis added).

748

states which base their informed consent claims on negligence principles."). But they do not argue that the Plan misclassifies their claims. Furthermore, the memorandum fails to show that none · of the other 49 + American jurisdictions shares Pennsylvania's allegedly peculiar notion of implied consent.

In the next breath, the Pennsylvania Claimants assert that the Plan's treatment

in §§ 1.101,[9] 8.3 and 8.5 [10] "impermissibly and unfairly limits the rights of the Pennsylvania Claimants." Although they do not assert that their rights are different than those possessed by citizens of other states, the Pennsylvania Claimants also argue that the Plan impermissibly prejudices their causes of action against Pennsylvania-based Settling Physicians [11] and Set-

9. Section 1.101 as defined in the Amended Joint Plan:

"*Malpractice Claims*" means Claims that are not affected by the releases of Settling Physicians and Settling Health Care Providers under the Plan. Solely for purposes of Section 8.3 and 8.5 of the Plan, "Malpractice Claim" shall have the meaning given to that term by applicable non-bankruptcy law, except that it shall exclude those Claims by Personal Injury Claimants against Settling Physicians and Settling Health Care Providers that are based on, related to, arising out of, or derived from injuries, illnesses or conditions allegedly resulting from (i) characteristics or alleged characteristics (as defined below) of Breast Implants or Other Products (including component parts thereof), silicone or other implant materials; (ii) failure to warn, make disclosure or provide adequate information to obtain informed consent, regarding the characteristics or alleged characteristics of Breast Implants, Other Products, silicone or other implant materials; or (iii) failure to use an alternative breast implant or other product, or sale, provision, distribution or selection of Breast Implants, Other Products, silicone or other implant materials, where the Claim is based on the characteristics or alleged characteristics of Breast Implants or Other Products. For the sole purpose of interpreting and applying this definition, the following are the "alleged characteristics" of Breast Implants and Other Products:

(1) that gel can bleed or leak through the shell of the Breast Implant;

(2) that gel can migrate within the body;

(3) that Breast Implant or Other Product materials will degrade or deteriorate;

(4) that Breast Implants can break or rupture even though they are not subjected to significant trauma, surgical or otherwise;

(5) that Breast Implants impede detection of other diseases, including, without limitation, breast cancer; and

(6) that Breast Implants, Other Products, silicone or other implant materials cause

diseases or combinations of conditions, symptoms or injuries, or are otherwise inherently defective.

Notwithstanding any of the foregoing, Malpractice Claims will not exclude claims for any injuries, diseases, illnesses or conditions allegedly resulting from or claimed as an element of damages in connection with (x) leakage or rupture of a Breast Implant or other complication or injury resulting from performance of implant surgery or other medical procedures in breach of the applicable standard of care; (y) express misrepresentation of the risks disclosed in the applicable product inserts; provided, however, nothing herein shall be interpreted to imply that misrepresentation of risks disclosed in applicable product inserts necessarily constitutes a breach of the applicable standard of care or a failure to obtain informed consent; or (z) the implantation of loose silicone gel by the Settling Physician.

10. Section 8.5 of the Amended Joint Plan, in relevant part, says:

*Channeling Injunction for Certain Claims.* Claims, if any, asserted by Non–Settling Personal Injury Claimants against the Settling Physicians and the Settling Health Care Providers (other than Malpractice Claims) shall be subject to the channeling injunction provisions of this section 8.5 in the event that jurisdiction over such Claims is transferred, as Claims "related to" this Case, to the District Court. If such transfer is not effected, the relief provided in this section is not effective as to Claims that are not transferred, and such Claims shall be resolved by the procedures applicable in the courts where actions based on such Claims have been (or may be) filed. In the event that any such Claims against a Settling Physician or Settling Health Care Provider are transferred to the District Court for liquidation, they shall be subject to the following Claims resolution procedures. . . .

11. Defined at § 1.162 of the Plan as "the Physicians in Class 12 who timely elect to

tling Health Care Providers[12] for negligent selection of a defective product. In essence, the Pennsylvania Claimants assert that the Plan's provisions for releases of their claims against Settling Physician Claimants is illogical, and there is no "rational basis for their inclusion in the Amended Plan." *Memorandum* at 21.

The objection is devoid of citation to any provision of the Bankruptcy Code which is allegedly violated by the parts of the Plan found offensive by the Pennsylvania Claimants. So we are left to guess at what, aside from their simple displeasure with the Plan, the legal issue is. The closest to a legal objection is that the Plan does not satisfy § 1129(a)(1). But, as stated above, those Pennsylvania Claimants who accepted the Plan have also accepted the Plan's terms about releasing claims against Settling Physicians. And, since those Pennsylvania Claimants who rejected the Plan have not released the Settling Physicians, it seems that they have nothing about which to complain.

The Pennsylvania Claimants' assertions that Pennsylvania law is somehow peculiar or idiosyncratic adds nothing to the issue of the validity of the releases or the power of the Court to enforce them by injunction. Accordingly, the Court's more generic comments regarding the scope of the release and injunction provisions suffice.

## C. Objections of the Official Committee of Unsecured Creditors

### 1. Section 502

The U/S CC, objected to confirmation of the Plan on a variety of grounds. This part of the opinion deals solely with the Committee's argument that permitting the Debtor, pursuant to provisions of the Plan, to settle and pay personal injury tort claims without the Court first ruling on the

Committee's objections to these claims deprives it of its statutory right to object to claims in violation of § 502. According to the U/S CC this means, says the Committee, that the Plan does not comply with applicable provisions of title 11 and so does not satisfy § 1129(a)(1).

Relying on *National Boulevard Bank v. Drive–In Dev. Corp. (In re Drive–In Dev. Corp.)*, 371 F.2d 215, 219 (7th Cir.1966); *Schreibman v. Walter E. Heller & Co.*, 446 F.Supp. 141, 144 (D.P.R.), *aff'd sub nom. Las Colinas Dev. Corp. v. Schreibman*, 577 F.2d 723 (1st Cir.1978); *In re Charter Co.*, 68 B.R. 225, 228 (Bankr.M.D.Fla.1986); and *In re Levy*, 54 B.R. 805, 807–08 (Bankr.S.D.N.Y.1985), the Committee asserts that § 502 gives it the right, as a "party in interest," to object to the personal injury claims filed in this case and to have the Court rule on its objections, even though the Debtor, as the debtor-in-possession, filed omnibus objections to these claims upon which it has even moved for summary judgment. As explained below, under the particular circumstances of this case, the U/S CC did not have the right to file objections to the product liability claims in the first place. It, therefore, does not have a right to have the Court rule on those objections before payments are made on these claims.

Section 502 provides, in relevant part:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall

---

settle their Claims against the Debtor, together with those Physicians who do not timely elect to litigate the allowability of their Claims against the Debtor."

12. Defined at § 1.159 of the Plan as "the Health Care Providers in Class 13 who timely elect to settle their Claims against the Debtor, together with those Health Care Providers who do not timely elect to litigate the allowability of their claims against the Debtor."

determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount. . . .

11 U.S.C. §§ 502(a)-(b).

 While the U/S CC is a "party in interest" under § 502 with the right to object to other creditors' claims, it is well-settled that the right nevertheless has limits. Even the cases cited by the U/S CC in support of its position recognize that

[m]ost courts . . . have limited the right of a general creditor to object to the claim of another creditor in certain instances in order to promote a more orderly administration of the estate, i.e., in cases where a trustee has been appointed to represent the interests of all general unsecured creditors.

*Charter*, 68 B.R. at 227 (citing *Schreibman*, 446 F.Supp. at 144 ("It is a well settled rule that creditors cannot object to the claims of other creditors in straight bankruptcy proceedings. This is so because in such proceedings it is the duty of the trustee to represent all the creditors and object [to] the allowance of such claims as may be improper. Under such a situation a creditor would lack standing to object to such claims.") (citations omitted); and *Drive-in*, 371 F.2d at 219 ("The rule requiring that the trustee initially object to the allowance of a claim in ordinary bankruptcies is a procedural rule evolved by the courts. Since the trustee is the representative of the creditors, it is a rule developed for the orderly administration of estates.")). A respected authority on bankruptcy echoes this rule:

There is no doubt that the phrase "parties in interest" in section 502(a) applies to those who have some interest in the assets of the debtor being administered in the case. Under such definition, the debtor's creditors are the primary parties in interest. In fact, the right of a creditor to object to the allowance of another creditor's claim should be undisputed on principle. *Yet the needs of* *orderly and expeditious administration do not permit the full and unfettered exercise of such right . . . [I]t is the trustee who acts as the spokesman for all creditors in discharge of the trustee's duty unless the trustee refuses to take action.*

4 *Collier on Bankruptcy*, ¶ 502.02[2][d], at 502–15 (emphasis added) (relying in part on *Fred Reuping Leather Co. v. Fort Greene Nat'l Bank*, 102 F.2d 372, 372–73 (3d Cir.1939)). The Advisory Committee Note to F.R. Bank. P. 3007, which covers the procedure for objecting to claims, likewise speaks of limiting creditors' role in the claims objection process:

While the debtor's other creditors may make objections to the allowance of a claim, the demands of orderly and expeditious administration have led to a recognition that the right to object is generally exercised by the trustee. Pursuant to § 502(a) of the Code, however, any party in interest may object to a claim. But under § 704 the trustee, if any purpose would be served thereby, has the duty to examine proofs of claim and object to improper claims.

*Id.* at 502–15 n. 17; *see also Charter*, 68 B.R. at 227; *In re Simon*, 179 B.R. 1, 7 (Bankr.D.Mass.1995). ("If every creditor were entitled to challenge the claim of another creditor filed in a particular case, an orderly administration could degrade to chaos.") (citing *Norton Bankruptcy Code Pamphlet*, Editor's Comment to Fed. R. Bankr.P. 3007 (1994–95)). For this policy reason, most courts, including those cited by the U/S CC, hold that where a trustee is charged with administering a bankruptcy estate, a creditor can object to the claim of another creditor only if, upon demand, the trustee refuses to do so and the court grants the creditor the right to act on behalf of the trustee. *See, e.g., Fred Reuping*, 102 F.2d at 372–73; *Charter*, 68 B.R. at 227; *Simon*, 179 B.R. at 6–7; *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1147 (1st Cir.1992). *Cf., e.g. Canadian Pacific Forest Prods. Ltd. v.*

*J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir.1995) (A creditor has only derivative standing to pursue a preference or fraudulent transfer action.); *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 247 (5th Cir.1988) (requiring a creditors' committee to show that the claim is colorable, that the debtor-in-possession refused unjustifiably to pursue the claim, and that the committee first received leave from the bankruptcy court to sue). *See also In re Valley Park, Inc.*, 217 B.R. 864, 866–69 (Bkrtcy.D.Mont.1998); *Unsecured Creditors Committee v. Farmers Savings Bank (In re Toledo Equipment Co.)*, 35 B.R. 315, 320 (Bankr.N.D.Ohio 1983); *In re Colfor, Inc.*, No. 96–60306, 1998 WL 70718, at *1 (Bankr.N.D.Ohio Jan. 5, 1998); *Official Committee of Unsecured Creditors of the Florida Group, Inc. v. First Union National Bank of Florida (In re Florida Group, Inc.)*, 123 B.R. 923, 924–25 (Bankr. M.D.Fla.1991); *Chemical Separations Corp. v. Foster Wheeler Corp. (In re Chemical Separations Corp.)*, 32 B.R. 816, 818 (Bankr.E.D.Tenn.1983).

The result is, of course, the same in a chapter 11 case where the debtor fills the role of trustee. 11 U.S.C. § 1107(a).

■ Therefore, despite §§ 1109(b) and 1103(c)(5), for the U/S CC to have the right to object to the breast-implant claims, it had to have made a demand of the Debtor to object to these claims which the Debtor refused. That is clearly not the case here. The Debtor filed an omnibus objection to the breast-implant claims on its own initiative. Later, the U/S CC filed its own objection to these same claims on the same basis. The Plan expressly preserves these objections. Under these circumstances, no useful purpose would be served in allowing the U/S CC to pursue its own objections to these claims. Conversely, allowing such a course of action would waste judicial resources and delay administration of the bankruptcy estate to its and its creditors' detriment with no corresponding benefit to the estate. This would undermine the articulated policy concern of an orderly and efficacious administration of the bankruptcy estate. Accordingly, the Court holds that the U/S CC's objections to the personal injury claims are not properly before it, and require no further action. As a result, this objection to confirmation is overruled.

The U/S CC also argues that given the structure of the Plan, no court will ever pass on whether these "settlements" satisfy the requirements of Rule 9019. And according to the Committee, this is contrary to established law that (i) settlements of claims must be evaluated by the court under the "fair and equitable" standard embodied in Rule 9019, whether the settlement is separate from or incorporated into a plan of reorganization; (ii) the parties proposing the settlement bear the burden to establish that the Rule 9019 standards are met; (iii) the court has an independent obligation to review the proposed settlement and exercise independent judgment as to whether it meets the applicable standards; and (iv) the settlement must be "fair and equitable" for nonsettling parties. *Memorandum of U/S CC in Support of Its Objections to Confirmation,* at 25.

■ The Committee asserts, incorrectly, that a bankruptcy court must independently review each settlement contained within a plan of reorganization for fairness and equity. Its sole support for this argument is *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–54, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). That case is not on point.

■ Although *TMT Trailer* involved the approval of a compromise which formed part of a reorganization plan, the statute then in effect (Chapter X of the Bankruptcy Act, 11 U.S.C. § 101, *et seq.,* repealed) required the bankruptcy court to determine that the plan was fair and equitable in every case. Under the current chapter 11, the requirement that a court

examine the fairness and equity of each particular settlement bound up in a reorganization plan has been omitted. Under the Code, the court looks into the fairness and equity of a plan only when a class of claims or interests has rejected it. *See* 11 U.S.C. § 1129(b). Inasmuch as Class 4 has rejected the Plan, it is this Court's duty to examine whether the Plan's treatment overall is fair and equitable as to claims in that class. This we have done in a separate opinion. Accordingly, the Committee's objections that the Plan improperly permits a settlement of personal injury claims without a separate fair-and-equitable determination is overruled.

### 2. Delay in Paying Claims

■ The U/S CC also argued that the Plan does not comply with the applicable provisions of the Bankruptcy Code because of the "potential for impermissible delays in distributions [to Class 4 claimants] under [the] Plan." *Objections of the Official Committee of Unsecured Creditors Under § 1129(a) of the Bankruptcy Code to Confirmation of the Amended Joint Plan of Reorganization* at 11. However, the U/S CC's memorandum in support of its objections lacked any argument on this issue. Accordingly, for the reasons noted previously, we conclude that the Committee waived its right to challenge confirmation based on this issue. Once again, though, even were we to consider the objection on the merits, the result would not change.

■ Section 1129(a)(1) requires that the Plan comply with all applicable Code provisions. Therefore, to state a cognizable violation of § 1129(a)(1), the U/S CC must delineate a provision of the Bankruptcy Code with which the Plan fails to comply. The U/S CC has failed to do so.

The U/S CC does not specify, (and the Court is unaware of), any Bankruptcy Code provision that is violated by plan terms that require distributions only on allowed claims and that permit the withholding of payments on claims subject to a legitimate dispute and ongoing litigation until a final determination on the allowance of the claims. To the contrary, this is standard practice in the litigation context both inside and outside of bankruptcy. Accordingly, this § 1129(a) objection to confirming the Plan is overruled.

### D. Objection of the Texas Comptroller of Public Accounts

The Texas Comptroller of Public Accounts ("Texas Comptroller") argues that the Plan does not comply with § 1123(a)(5)(G), which requires that a plan provide adequate means for implementation, because it does not specify what remedies the Comptroller will have in the event the Reorganized Debtor defaults on its priority tax obligations.

■ The frivolous and nonsensical nature of the Texas Comptroller's "failure to provide a remedy in the event of default" objection was recently addressed by this Court in *Xofox, supra* p. 727. That case involved an identical objection by the State of Michigan's Department of Treasury. The Court observed that, pursuant to § 1141(a), the confirmation of a plan creates a legally binding agreement. *Id.* The terms of that agreement can be enforced in any court of competent jurisdiction. As a result, it is unnecessary for a plan to state that a taxing authority has the ability to enforce a debtor's plan obligations in a state court of competent jurisdiction. For these reasons, the Texas Comptroller's objection is overruled.

### E. Objection of Certain Brazilian Claimants

■ Without specifying that § 1129(a)(1) was their focus, certain Brazilian Claimants argued that the Plan's treatment of attorney's fees of settling personal injury claimants is improper. The Court can conceive of no other place to consider this than in an opinion on whether this term "complies with the applicable provisions of . . . title [11]."

The Brazilian Claimants worry that this provision could "drive a wedge between claimants and their attorneys." They state that they "are very concerned about this intrusion upon their legal representation." *Objection of the Brazilian Claimants* at 8–9.

These claimants have nothing to fear in this regard. They have two options. First, if they wish, they can always honor their retainer agreements notwithstanding the protection that the Plan seeks to afford them. Second, they can factor this complication into their decision on whether to resolve their claims in the Litigation Facility or the Settlement Facility. Each claimant will have a myriad of factors to consider on this important choice; whether a rift might open with her counsel if she chooses the Settlement Facility is just one of them.

As for the actual merits of the objection, the Brazilian Claimants fail to cite any case law in support of their position. More importantly, they fail to identify a Bankruptcy Code provision that would be violated by such a limit on attorneys fees.[13] Consequently, this provision does not support a denial of confirmation.

## F. Objection of Certain Spouses of Breast–Implant Claimants

Attorney Alan B. Morrison, representing several spouses of breast-implant claimants, asserts that the Plan's provisions for their claims violates several sections of title 11. The Plan provides that personal injury claimants may liquidate their claims by suing the Litigation Facility. *Plan,* § 5.4.2; *see also Litigation Facility Agreement.* Claims for loss of consortium by spouses of implant claimants would also be litigated in the same manner as they would outside of bankruptcy.

These claimants make no objection to this provision.

However, they do object to the Plan's treatment of their claims in the event that their spouses opt out of the Litigation Facility and settle their claims in the Settlement Facility. The Plan provides that the "option to settle Consortium Claims shall be controlled by and be subject to the election of the Breast Implant Claimant." ¶ 1.1(B)(5)(a). It further states that "any and all Consortium Claims related to that Primary Claimant shall be deemed settled and discharged for no additional compensation regardless of whether the [spouse] elects or would have elected to litigate his or her Consortium Claim separately." *Id.* The Plan explains the underlying rationale for this provision by saying that the monetary award received by the settling implant claimant is "intended to cover both the primary claimant and the related consortium claims." *Id.*

These objectors flail about, arguing that the provision is "fundamentally unfair" to them and that the Plan ought to be written differently. *Objections to Reorganization Plan of Breast Implant Claimants Rita Altig and Others ("Morrison Objections")* at 9. No doubt had they been the drafters of the Plan, it would have been written differently. But the Plan was painstakingly negotiated over a lengthy period by bitter adversaries, and this Plan is what resulted. The issue is whether the provisions in question comply with title 11. Unfortunately, the objectors cite no provision of title 11 (but for § 1129(b)'s absolute priority principle)[14] allegedly violated by this Plan term.

The Plan provides for the payment of consortium claims. If the primary implant claimant chooses to litigate, if there is also a loss-of-consortium claim, it, too, will be tried. And consortium claims will be paid

**13.** For what it is worth, it appears that federal courts do have the authority to modify contingency fee agreements. *See Green v. Nevers,* 111 F.3d 1295, 1302–03 (6th Cir. 1997).

**14.** Section 1129(b) does not apply to their claims because the classes in which their claims are classified overwhelmingly accepted the Plan.

in full if a plaintiff's judgment results. Consortium claims will also be paid by the Settlement Facility.

 These objectors would prefer a model whereby the husband and the wife can make independent decisions about settlement. *Morrison Objections*, at 7–8, 11–12. But that ivory-tower model doesn't exist even outside bankruptcy. A defendant is unlikely to settle part of a lawsuit: If both the wife-plaintiff and the husband-plaintiff do not agree to settle, there will be no settlement. The Plan—proposed by the TCC as well as the Debtor—takes the reasonable and efficient view that the family should divide the award the way it sees fit. And it makes eminently good sense for the bankruptcy estate and the Reorganized Debtor to stay out of the marital affairs of the hundreds of thousands of claimants.[15] While these objectors may prefer their model, the Plan's methodology is not prohibited by title 11.

Accordingly, the Plan complies with the applicable provisions of the Code.

---

**15.** While these objectors parade hypothetical horrible examples which might arise from the Plan's methodology, *see Morrison Objections* at 7–8, they overlook the horribles which their own scheme might produce. They posit a plan in which the husband and the wife can separately decide to settle or not. They neglect to recognize that such a plan would not likely contain (as this one does) a standing, open offer to implant claimants who qualify for a fixed benefit to simply come and get it. As noted in text, the plan would more likely propose a settlement only if both spouses agree so that one cannot settle while the other goes and litigates. In that world, an estranged or ex-husband of a primary claimant can extort the primary claimant by simply being recalcitrant. Or, in a fit of spite, he might simply veto any settlement no matter how reasonable to him or to the primary claimant just to make her suffer years of litigation hell.